**Robert F. DAVIS, Appellant,**

v.

**James GRUSEMEYER, Raymond Gurak, Donald Yingling, David V. Brody, and Charles E. Waldron.**

No. 92–5344.

United States Court of Appeals, Third Circuit.

Argued Feb. 26, 1993.

Decided June 8, 1993.

---

Dennis T. Kearney (argued), Elizabeth J. Sher, Loryn P. Riggiola, Pitney, Hardin, Kipp & Szuch, Morristown, NJ, for appellant.

Stuart M. Gerson, Asst. Atty. Gen., Michael Chertoff, U.S. Atty., Margaret S. Hewing (argued), Civ. Div., Dept. of Justice, Washington, DC, for appellee Yingling.

Robert J. Del Tufo, Atty. Gen., James D. Harris (argued), Deputy Atty. Gen., Dept. of Law and Public Safety, Trenton, NJ, for

appellees Grusemeyer, Gurak, Brody and Waldron.

Before: HUTCHINSON and NYGAARD, Circuit Judges and POLLAK, District Judge.*

## OPINION OF THE COURT

LOUIS H. POLLAK, District Judge.

Plaintiff Robert F. Davis—tripped up by a joint state-federal undercover law enforcement operation in 1985 and then, for nearly five years, entangled in the New Jersey criminal courts—filed this action in the United States District Court for the District of New Jersey, challenging conduct involved in the government sting and his subsequent prosecution. This appeal from the district court's dismissal of plaintiff's case pursuant to Fed.R.Civ.P. 12(b)(6) raises two issues: (1) whether plaintiff's claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* (1988 and Supp. II), are barred by the applicable four-year statute of limitations; and (2) whether state prosecutors, and a police investigator working at the behest of those prosecutors, are absolutely immune from liability for their involvement in plaintiff's odyssey through the New Jersey criminal system.

I.

*Factual and Procedural History*

For purposes of reviewing a dismissal pursuant to Fed.R.Civ.P. 12(b)(6), all factual allegations of the complaint are taken as true and liberally construed. *Wisniewski v. Johns–Manville Corp.,* 759 F.2d 271, 273 (3d Cir.1985). Viewed through this prism, a story of some intrigue takes shape.

Sometime in March of 1985, law enforcement officials of the New Jersey State Police, the New Jersey Division of Criminal Justice (a branch of the Office of the Attorney General), and the Federal Bureau of Investigation ("FBI") jointly commenced an undercover operation in an effort to identify and

---

* Honorable Louis H. Pollak, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

break up automobile theft rings in the Southern New Jersey and Philadelphia areas. Under the plan, known as "Operation Carrus," the officials opened a "chop shop"—a business that dismantles and resells stolen vehicles—to cater to persons trafficking in stolen automobiles and parts. To operate the shop—which was set up in Winslow Township, New Jersey, under the name "JJD Enterprises"—the various officials received, transported and dismantled a number of stolen automobiles, without notifying the owners of these vehicles of these events, and resold their parts. Employed in Operation Carrus were, among others, defendants Donald Yingling, then a special agent of the FBI, James Grusemeyer, a Detective–Sergeant for the New Jersey State Police, and David Brody, Esq., a Deputy Attorney General for the New Jersey Division of Criminal Justice.[1]

On June 17, 1985, plaintiff Davis, owner of an auto body shop in North Wildwood, New Jersey, delivered to JJD Enterprises a 1984 Cadillac Seville owned by a third party (Robert Churchill). Davis, who conveyed the automobile to JJD Enterprises at Churchill's request, was unaware that JJD Enterprises was an undercover operation. Upon receipt of the 1984 Seville, JJD Enterprises reconstructed that vehicle with parts from a stolen 1985 Seville that earlier had been recovered and dismantled by JJD Enterprises. According to the complaint, this conversion was merely one of a number performed by JJD Enterprises in a period extending from May through July of 1985.

As a consequence of Davis' delivery of the vehicle to the chop shop, the New Jersey State Police came to suspect that Davis was involved in the redistribution of stolen automobile parts. On March 26, 1986, a state grand jury in Camden, New Jersey indicted him for offenses related to the delivery of the 1984 Seville, including alteration of a vehicle identification number and participation in a conspiracy to reconstruct the 1984 Seville with stolen parts. After the indictment was issued, the police obtained a search warrant for Davis' auto body business, and, on April 8, 1986, seized three tow trucks which they believed to be composed of stolen parts.

On June 9, 1986, Davis applied for admission to Camden County's Pretrial Intervention Program (PTI). PTI, a New Jersey-wide program, is an alternative to criminal prosecution wherein, upon recommendation of the director of the county's PTI program and with the consent of the prosecutor, proceedings against the indictee may be postponed for up to three years during which time the indictee participates in a rehabilitation program. See N.J.Stat.Ann. §§ 2C:43–12, 2C:43–13 (West 1992). At the conclusion of the supervisory treatment, and with the consent of the prosecutor, the judge designated to act on matters relating to PTI may dismiss the participant's indictment or, if the conditions of intervention have been breached, allow the prosecution to go forward. Id. at § 2C:43–13. The Camden County PTI program denied Davis' PTI application on July 24, 1986; a letter forwarded to Davis by the PTI program explained that (defendant) Charles E. Waldron, Esq., a Supervising Deputy Attorney General who was the official in the Attorney General's office principally overseeing Davis' case, believed that Davis should not be admitted to PTI due to his participation in an ongoing car theft enterprise.[2]

On August 11, 1986, a second state grand jury—this time in Cape May, New Jersey—indicted Davis for various offenses (including conspiracy, receipt of stolen property, possession of vehicles with removed or altered identification, and unlawful purchase of a firearm) arising from the search of his premises and recovery of the tow trucks. Davis applied again for admission to PTI, and, on December 2, 1986, his application was also rejected for this second indictment due to the

---

1. According to the complaint, Brody functioned as a legal adviser to JJD Enterprises.

2. Participation in "a continuing criminal business or enterprise" is ground for exclusion from PTI. *State v. Marie*, 200 N.J.Super. 424, 491 A.2d 784, 785 (1984) (quoting THE GUIDELINES FOR THE OPERATION OF PRETRIAL INTERVENTION IN NEW JERSEY, Guideline 3(i)(2) (1979), adopted by the Supreme Court of New Jersey as part of the NEW JERSEY RULES GOVERNING CRIMINAL PRACTICE, Rule 3:28, under the authority of N.J.Stat.Ann. § 2C:43–14 (West 1992)).

perceived ongoing nature of his offenses. One week later—on December 9, 1986—Davis sent a letter to the insurance carrier for the 1985 Seville (the automobile that had been used to reconstruct the 1984 Seville that Davis had delivered to JJD Enterprises). In that letter, he advised the carrier that the 1985 Seville had been stolen, recovered and dismantled by certain of the defendants and then used to reconstruct another car. As a result of this letter, the insurance carrier sought reimbursement from those defendants.

In June 1987, the Division of Criminal Justice reversed its position on Davis' admission to PTI. Now acknowledging that the evidence did not suggest that Davis was part of organized criminal activity or an ongoing criminal business, the Division advised the Cape May PTI coordinator that Davis should be allowed to enter the PTI program with respect to both the Camden and Cape May indictments, provided that Davis would agree to sign over title to one of the seized tow trucks and indemnify the appropriate parties for stolen parts contained in the other two trucks. Davis agreed to these terms.[3]

On October 14, 1987, defendant Waldron and defendant Raymond E. Gurak, Esq. (a lawyer who worked under Waldron's supervision at the New Jersey Criminal Justice Division and had been recently assigned to the Davis case[4]) took steps to have the Division of Criminal Justice change course once again. Specifically, Waldron and Gurak recommended that Davis' participation in PTI be revoked and that both the Camden and Cape May indictments be restored to active prosecution; in support of the recommendation, they represented that Davis' offenses were serious and that he was involved in an ongoing criminal enterprise. As a result, Davis' participation in PTI was revoked.

On June 1, 1988, the Cape May grand jury issued an indictment that superseded the first Cape May indictment; the superseding indictment removed the conspiracy and fire-

arm counts and retained one count of possession of a motor vehicle or part thereof with altered identification numbers and three counts of receiving stolen property (a tow truck and tow truck parts). Two days later, Gurak and Waldron moved to dismiss the original Camden indictment indicating that there was a lack of sufficient evidence that Davis knew that the vehicle in question (the 1985 Seville) was stolen and, therefore, lack of evidence of participation in a conspiracy. Davis renewed his application for admission to PTI with respect to the second Cape May indictment. Although the Cape May PTI coordinator recommended approval of Davis' renewed application, Gurak and Waldron continued to oppose Davis' admission, representing that Davis was involved in continuing criminal dealings.

Ultimately, Davis' PTI application was denied, and, on September 13, 1988, he went to trial on the second Cape May indictment. The jury acquitted Davis of two counts of receiving stolen property and convicted him of one count of receiving stolen property and one count of possession of a vehicle or vehicle part with altered identification numbers. However, in October 1990, the New Jersey Superior Court vacated the conviction on both counts: finding that the State had created a legitimate expectation that Davis would be admitted to PTI, the Superior Court ordered Davis' admission to PTI. *See State v. Davis,* 244 N.J.Super. 180, 581 A.2d 1333 (1990). In February 1991, Davis was simultaneously admitted to and discharged from PTI, and the two counts of the second Cape May indictment on which he had been convicted were dismissed.

Davis filed the instant complaint on February 22, 1991 against the four state defendants—Grusemeyer, Brody, Gurak and Waldron—and the federal defendant, Yingling. The complaint includes claims founded on three sources: RICO, 42 U.S.C. § 1983, and state law. In the RICO counts, defendants

3. According to the complaint, Davis' property was "disposed of" sometime after December 1988. App. at 23 (Complaint at ¶ 87).

4. Apparently, Leo Cox, also a Deputy Attorney General within the Division of Criminal Justice,

was directly responsible for the early handling of Davis' case, before that responsibility was reassigned to Gurak. *See* App. at 56, 58. Cox is not named as a defendant in the case at bar.

Yingling and Grusemeyer are charged with participating in "racketeering activity" on behalf of JJD Enterprises through receipt and transportation of several stolen automobiles, and investing money received from Operation Carrus in JJD Enterprises (the RICO "enterprise"). Additionally, defendants Brody, Yingling, and Grusemeyer are claimed to have conspired to commit those offenses. Under section 1983, Davis asserted various claims directed at defendants' investigative activities and the seizure and disposal of his property. Davis also challenged his prosecution in several section 1983 allegations that the district court grouped together as "malicious prosecution" claims; specifically, Davis claimed that all of the defendants—that is Yingling, Grusemeyer, Brody, Gurak and Waldron—maliciously prosecuted and conspired to maliciously prosecute him,[5] and that Gurak, Waldron and Grusemeyer intentionally and maliciously revoked Davis' participation in PTI. Finally, Davis included state law claims of intentional and negligent infliction of emotional distress against all five defendants.

On May 1, 1991, the state defendants moved to dismiss the complaint for failure to state a claim,[6] and, after hearing oral argument, the district court granted that motion in its entirety on March 23, 1992. The district court found that the RICO claims were time-barred. Turning to the section 1983 allegations, the court found that most of these claims were also untimely; however, the malicious prosecution claims survived the district court's statute of limitations analysis.[7] Nevertheless, the district court dismissed the several malicious prosecution claims on the basis of absolute immunity.[8] Because no federal claim remained, the district court dismissed the pendent state law claims for lack of subject matter jurisdiction, thereby dismissing Davis' entire complaint. Thereafter, Davis filed a motion to reconsider, which the district court denied on May 21, 1992. On June 19, 1992, Davis filed a notice of appeal from the May 21, 1992 order.

Davis places two questions before us for review: (1) whether the district court erred in dismissing his RICO claims as time-barred;[9] and (2) whether, particularly with respect to Davis' claim that the various defendants maliciously interfered with his admission to PTI, the district court misapplied the doctrine of absolute prosecutorial immunity. Exercising plenary review over the Rule 12(b)(6) dismissal, see Scattergood v. Perelman, 945 F.2d 618, 621 (3d Cir.1991), we affirm the district court in all respects.

## II.

### Accrual of the RICO Claims

■ RICO does not contain an express statute of limitations for civil actions; accordingly, the Supreme Court has fashioned one—a limitations period of four years. See Agency Holding Corp. v. Malley–Duff & Assocs., Inc., 483 U.S. 143, 152–56, 107 S.Ct. 2759, 2765–67, 97 L.Ed.2d 121 (1987) (draw-

---

5. In the complaint, Davis alleged that Yingling, although a federal agent, acted under the color of state law due to his connection with a state investigation and with state officials. The district court dismissed the malicious prosecution claims against Yingling for insufficient pleading, see infra note 21; however, the district court opinion did not discuss whether the malicious prosecution claims against Yingling should have been treated as claims under Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), or whether those claims were properly brought under section 1983. Because plaintiff has not disputed the dismissal of the malicious prosecution claims against Yingling, we need not resolve this question.

6. Federal defendant Yingling later filed a separate motion to dismiss for failure to effect service of process; however, the district court dismissed that motion as moot in light of its sua sponte dismissal of all claims against Yingling pursuant to Rule 12(b)(6).

7. The district court reasoned that the malicious prosecution claims—and those claims alone—ran from the date that Davis' indictment was dismissed (February 1991) because such claims could not have been brought until the criminal proceedings against Davis were terminated in his favor.

8. With respect to Yingling, the district court dismissed the malicious prosecution claims for insufficient pleading. See infra note 21.

9. Plaintiff does not challenge the district court's determination that the various section 1983 claims (save the malicious prosecution claims) were untimely.

ing upon the Clayton Act's four-year statute of limitations). Because the complaint was filed on February 22, 1991, any claims determined to have accrued prior to February 22, 1987 would be barred. Civil RICO claims accrue at the time when the plaintiff knew or should have known that the elements of a civil RICO action existed. *Keystone Ins. Co. v. Houghton*, 863 F.2d 1125, 1126 (3d Cir. 1988). However, if further predicate acts occur that are part of the same pattern of racketeering, regardless of whether they injure the plaintiff, or if the plaintiff suffers further injury from a predicate act that is part of the same pattern of racketeering, even if that predicate act occurred outside the limitations period, the statute of limitations begins to run from the date that the plaintiff knew or should have known of the last such act or the last such injury. *Id.*

■ "When reviewing a Rule 12(b)(6) dismissal on statute of limitations grounds, we must determine whether 'the time alleged *in the statement of a claim* shows that the cause of action has not been brought within the statute of limitations.'" *Cito v. Bridgewater Township Police Dept.*, 892 F.2d 23, 25 (3d Cir.1989) (emphasis in original) (quoting *Bethel v. Jendoco Constr. Corp.*, 570 F.2d 1168, 1174 (3d Cir.1978)).[10] The complaint alleges that defendants Grusemeyer and Yingling, by receiving, transporting, and selling stolen property, conducted the affairs of JJD Enterprises through a pattern of racketeering in violation of 18 U.S.C. § 1962(c), invested the proceeds of that racketeering in violation of section 1962(a), and, along with defendant Brody, conspired to breach sections 1962(a) & (c) in violation of section 1962(d). The district court concluded that because the last predicate act of automobile theft alleged to have been committed by Operation Carrus

occurred on July 29, 1985, and because Davis knew or should have known that each element of his RICO cause of action existed by December 9, 1986 (when Davis advised the 1985 Seville's insurance carrier by letter that law enforcement officials had dismantled the 1985 Seville), his RICO claims (filed on February 22, 1991, more than four years after Davis wrote the letter) were untimely.[11] Davis argues that the district court erred in two ways: (1) by deciding that the statute of limitations began to run on December 9, 1986, notwithstanding that, as Davis sees the matter, a conspiracy to manipulate the prosecution of Davis in order to cover up Operation Carrus' racketeering activity continued at least until February 1991; and (2) by overlooking what Davis perceives as his "last injury"—the State's disposal of his property (the tow trucks) sometime after December 1988.

### 1. The Alleged Cover-up

Paragraph 83 of the complaint alleges that, in June 1988, Gurak—who was not named as a defendant in the RICO counts—"obtained the Second Cape May Indictment in a deliberate effort to undermine the preemptory trial date which had been set for four months, and in a deliberate effort to cover up defendants' criminal conduct in Operation Carrus." App. at 22. Davis argues that this conduct, along with other acts of manipulation by the state prosecutors and the self-concealing nature of Operation Carrus, constituted "fraudulent concealment" and tolled the RICO statute of limitations. Davis also asserts that this prosecutorial conduct was additional RICO activity that, of its own force, extended the RICO limitations period. We address these arguments in turn.

---

10. We are mindful that the applicability of the statute of limitations usually implicates factual questions as to when plaintiff discovered or should have discovered the elements of the cause of action; accordingly, "defendants bear a heavy burden in seeking to establish as a matter of law that the challenged claims are barred." *Van Buskirk v. Carey Canadian Mines, Ltd.*, 760 F.2d 481, 498 (3d Cir.1985).

11. In urging the district court to dismiss the RICO claims, defendants argued not only that the claims were time-barred, but also that (1)

trafficking in stolen goods did not constitute predicate criminal activity when done by law enforcement officials in good faith and as part of their employment, and (2) plaintiff had failed to describe either a "pattern" of racketeering or a RICO injury. Finding the RICO claims to be untimely, the district court did not address these additional arguments. Because we conclude that the RICO claims were properly dismissed on statute of limitations grounds, we similarly need not consider these alternative grounds for dismissal.

## A. The Fraudulent Concealment Tolling Doctrine

Fraudulent concealment is an "equitable doctrine [that] is read into every federal statute of limitations." *Holmberg v. Armbrecht*, 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90 L.Ed. 743 (1946); *see Bath v. Bushkin, Gaims, Gaines and Jonas*, 913 F.2d 817, 821 (10th Cir.1990) (per curiam) (standard tolling exceptions, such as fraudulent concealment, apply to civil RICO causes of action); *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1105 (2d Cir.1988) (same), *cert. denied*, 490 U.S. 1007, 109 S.Ct. 1642, 104 L.Ed.2d 158 (1989).[12] However, fraudulent concealment may toll the statute only if it misleads a plaintiff into thinking that he does not have a cause of action.

> The doctrine of fraudulent concealment does not come into play, whatever the lengths to which a defendant has gone to conceal the wrongs, if a plaintiff is on notice of a potential claim. A key aspect of a plaintiff's case alleging fraudulent concealment is therefore proof that the plaintiff was not previously on notice of the claim he now brings.

*Hobson v. Wilson*, 737 F.2d 1, 35 (D.C.Cir. 1984) (discussing federal fraudulent concealment doctrine, *see supra* note 12), *cert. denied sub nom. Brennan v. Hobson*, 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985); *see also Riddell v. Riddell Washington Corp.*, 866 F.2d 1480, 1495 (D.C.Cir.1989) (confirming this proposition); *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir.) (fraudulent concealment tolls the Clayton Act—from which the civil RICO limitations period is derived—only if plaintiff "remained in ignorance of [his] cause of action until some point within four years of the commencement of his action"), *cert. denied*, 488 U.S. 848, 109 S.Ct. 128, 102 L.Ed.2d 101 (1988).[13]

Defendants contend—as the district court held—that the contents of Davis' December 9, 1986 letter, as described in the complaint,[14] demonstrate that well before Gu-

---

**12.** Because the statute of limitations for civil RICO violations is derived from an analogous federal statute (rather than borrowed from state law), *see Malley–Duff, supra*, federal fraudulent concealment doctrine, rather than state fraudulent concealment doctrine, is adopted for civil RICO claims. *See, e.g., McCool v. Strata Oil Co.*, 972 F.2d 1452, 1463 (7th Cir.1991); *Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1199 (9th Cir.1988); *cf. New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir.1988) (applying federal fraudulent concealment doctrine to Clayton Act claims).

**13.** In addition to plaintiff ignorance of the cause of action persisting into the limitations period, the other elements of fraudulent concealment needed to toll a federal statute of limitations are: that "the defendant concealed from [plaintiff] the existence of his cause of action," and "that [plaintiff's] continuing ignorance was not attributable to lack of diligence on his part." *Hendrickson*, 840 F.2d at 1083; *see also Berkson v. Del Monte Corp.*, 743 F.2d 53, 55 (1st Cir.1984), *cert. denied*, 470 U.S. 1056, 105 S.Ct. 1765, 84 L.Ed.2d 826 (1985), *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir.1975). As plaintiff allows, his fraudulent concealment claim—which is subject to the heightened pleading requirements of Fed.R.Civ.P. 9(b), *see Byrnes v. DeBolt Transfer, Inc.*, 741 F.2d 620, 626 (3d Cir.1984)—was not pled with sufficient particularity in the complaint. Plaintiff not only failed to plead facts showing that he exercised due diligence in trying to uncover the nature of the allegedly self-concealing Operation Carrus, as he was required to do, *see, e.g., Wood v. Carpenter*, 101 U.S. (11 Otto) 135, 143, 25 L.Ed. 807 (1879), but also failed to allege active concealment by any "defendant," given that Gurak—who is claimed to have issued the superseding indictment in order to cover-up Operation Carrus—is not named in the RICO counts. Concealment by a third party may not be attributed to the named defendants for purposes of tolling the statute of limitations absent some special connection between the third party and the named defendant(s). *See, e.g., Kreiger v. United States*, 539 F.2d 317, 321–22 (3d Cir.1976). Therefore, to state a claim of fraudulent concealment based on Gurak's conduct, Davis would have to describe a conspiracy to conceal Operation Carrus' racketeering activity in which Gurak and the RICO defendants participated. *See Riddell*, 866 F.2d at 1493 ("[A]t least where the original conspiracy contemplates concealment, or where the concealment is in furtherance of the conspiracy, affirmative acts of concealment by one or more of the conspirators can be imputed to their co-conspirators for purposes of tolling the statute of limitations.") However, amendment of the complaint to aver facts supporting these allegations is unnecessary because, as we hold in the text, Davis' fraudulent concealment claim fails as a matter of law.

**14.** The letter itself is not before us, and, because we are reviewing a 12(b)(6) dismissal, we accept as true the complaint's characterization of the contents of the letter.

rak's asserted manipulation of Davis' prosecution and despite the secretive nature of Operation Carrus, Davis had sufficient knowledge of defendants' activities to make him chargeable as of that date with discovery of the elements of his RICO claims.[15] According to the complaint, the letter

> advised the insurance carrier for the 1985 Seville that the automobile had been stolen [from its owner], recovered intact by law enforcement personnel, dismantled by certain of the defendants, and the parts used to reconstruct another car.

App. at 17 (Complaint at ¶ 51). Davis argues that the December 9 letter, as described, shows only that Davis knew that defendants engaged in criminal activity with respect to the 1985 Seville, not that Davis knew that this one predicate act was part of a pattern of racketeering by the defendants. *See Keystone*, 863 F.2d at 1130 ("Plaintiffs must not only be in a position where they know or should know of their injury, they must also be in a position where they know or should know that the predicate act causing injury is part of a pattern of racketeering.").[16] According to Davis, the clandestine nature of defendants' operation and the conspiracy to keep it secret prevented him from discovering that Operation Carrus involved a number of stolen vehicles until much later than December 1986. However, according to the complaint, by December 1986 Davis' premises had been searched, his tow trucks had been confiscated, and he had been indicted for events relating to the delivery of the 1984 Seville (as well as for the receipt of stolen parts in the tow trucks). Therefore, by De-

cember 1986, Davis is chargeable with knowledge that the chop shop to which he delivered the 1984 Seville was operated by law enforcement personnel (as the letter itself indicates); moreover, aware as of December 1986 that the chop shop was a sting operation dependent on dismantling stolen vehicles and reselling their parts, Davis could not reasonably have believed that he was the only customer of JJD Enterprises and that this chop shop had dismantled only one stolen car. At the very least, by the time he wrote the December 9, 1986 letter, Davis was sufficiently on notice of the possibility that JJD Enterprises had made use of a number of stolen vehicles such that any failure to investigate further and discover this pattern was inconsistent with the exercise of due diligence required in order to employ the fraudulent concealment doctrine to toll the statute of limitations. *See supra* note 13; *Wood v. Carpenter*, 101 U.S. (11 Otto) 135, 143, 25 L.Ed. 807 (1879) ("There must be reasonable diligence; and the means of knowledge are the same thing in effect as knowledge itself."). Therefore, given that, on the face of the complaint, Davis was on notice of the operative facts forming the basis of his RICO claims by December 1986, his claim of fraudulent concealment, based largely on conduct well after that date, provides no basis on which to save his untimely RICO claims.

### B. Concealment of Racketeering Activity as a Predicate RICO Act

■ We also reject Davis' argument that the purported manipulation of Davis' prosecution, because designed to conceal Operation Carrus' racketeering activity, should be

---

**15.** It is well settled that the crucial question is plaintiff's awareness of each element of his RICO claim, not "cognizance of the *legal* implication of these facts, that is, that there is a civil RICO cause of action...." *Keystone*, 863 F.2d at 1128 (emphasis in original).

**16.** *See also Glessner v. Kenny*, 952 F.2d 702, 706 (3d Cir.1991) (footnote omitted) ("[A] [RICO] plaintiff's limitation period must be measured from the time it knew or should have known of the pattern of racketeering activity."). At one place in his reply brief, plaintiff appears to suggest that even knowledge of a pattern would not suffice to commence the limitations period because he must have known "of all the predicate acts that encompass the pattern of racketeering recited in the Complaint." Appellant's Reply

Brief at 9. However, the question is not when Davis knew each and every predicate act charged in the complaint, but when he knew or, with reasonable diligence, should have known that defendants' conversion of the stolen 1985 Seville was part of a developed pattern of racketeering. (Indeed, a RICO plaintiff need not even allege each and every predicate act that is part of the pattern of racketeering. *See Barticheck v. Fidelity Union Bank/First Nat'l State*, 832 F.2d 36, 39 (3d Cir.1987) (holding that a complaint that pled "two or more" acts of mail fraud sufficiently alleged a RICO pattern because "it may be fairly inferred from the nature of the scheme that defendants engaged in considerably more than two such acts")).

treated as ongoing RICO activity and itself extend the RICO limitations period through the period of Davis' prosecution. The prosecutors' actions could of their own force extend the RICO limitations period in two conceivable ways: (1) as additional racketeering activity, or (2) as non-racketeering acts that, in furtherance of a continuing section 1962(d) conspiracy, caused Davis harm.

Further predicate acts committed within the limitations period provide a basis for recovery for predicate acts taking place outside the limitations period, provided that the later acts are part of the same pattern as the earlier acts. *Keystone,* 863 F.2d at 1130. However, Davis does not explain why—and we fail to see how—the actions related to Davis' prosecution (such as the issuance of a superseding indictment and the refusal to admit Davis to PTI) constituted "predicate acts," where that means "racketeering activity" either "chargeable under State law and punishable by imprisonment for more than one year" or indictable under specified federal statutes. § 1961(1); *see Sedima,* 473 U.S. at 495, 105 S.Ct. at 3284 ("predicate acts" for section 1962's first three subsections include only "racketeering activity" as described in section 1961(1)). Moreover, the relationship of the alleged malicious prosecution of Davis to the automobile thefts involved in Operation Carrus—predicated on the conclusory cover-up allegation—is "too attenuated to be considered part of the same pattern of racketeering activity." *Shearin v. E.F. Hutton Group, Inc.,* 885 F.2d 1162, 1168 (3d Cir. 1989) (allegations of hiring fraud, although purportedly done to further a securities fraud scheme, cannot be considered part of the same pattern as the securities fraud scheme where the two types of fraud were dissimilar in character). This is especially so absent any allegation that those who prosecuted Davis (Gurak and Waldron) were involved in Operation Carrus.

■ This leaves the second possibility: that the alleged prosecutorial manipulation—although not section 1961(1) racketeering activity—was an "overt act" that furthered the section 1962(d) conspiracy and caused Davis harm. *See Shearin,* 885 F.2d at 1169 ("Predicate acts for [section 1962(d) ] conspiracy do not of necessity consist of section 1961(1) racketeering activity."). In *Shearin,* plaintiff claimed that she was fired to preserve a RICO scheme of securities fraud in which she refused to participate. In deciding whether plaintiff had standing to sue under section 1962(d), this court held that her firing—even though not itself racketeering activity—counted as RICO injury because it was done "[to] further a section 1962(d) conspiracy." *Id.* Assuming, *arguendo,* that a section 1962(d) conspiracy claim accrues only upon discovery of the last overt conspiracy act (whether that act qualifies as racketeering activity or not)—a question that we need not resolve today—it would still be inappropriate to extend the limitations period through the "malicious" prosecution because that prosecution was not in furtherance of an ongoing RICO conspiracy.

A section 1962(d) conspiracy—that is, a conspiracy to violate any of the first three subsections of section 1962—consists of "agreement to commit predicate acts" that are part of a pattern of racketeering, *Shearin,* 885 F.2d at 1168–69, and nothing in the complaint suggests that JJD Enterprises' racketeering activity continued beyond July 1985. Therefore, unlike the asserted scenario in *Shearin*—where the "overt act" of firing was alleged to have occurred while the underlying racketeering activity was still ongoing, as an "essential" aspect of the conspiracy to violate state and federal securities laws, 885 F.2d at 1168—Davis' "malicious" prosecution, as described, was designed at most to conceal the commission of past acts of wrongdoing. An attempt to cover up a completed scheme of criminal activity, while it might have tolled the statute of limitations had it effectively kept plaintiff from discovering the cause of action, *see supra* Section II, Part 1, Subpart A, does not constitute a predicate act in furtherance of a RICO conspiracy that might itself postpone accrual of a section 1962(d) claim. *Cf. Grunewald v. United States,* 353 U.S. 391, 405, 77 S.Ct. 963, 974, 1 L.Ed.2d 931 (1957) (emphasis in original) (making a "vital distinction ... between acts of concealment done in furtherance of the *main* criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained, for the

purpose only of covering up after the crime;" the former acts alone postpone accrual of a criminal conspiracy claim); *United States v. Pecora,* 798 F.2d 614, 630 (3d Cir.1986) (applying *Grunewald's* "vital distinction" to Fed.R.Evid. 801(d)(2)(E)'s "in furtherance of the conspiracy" requirement for admission of coconspirator hearsay; statements concealing the existence of a conspiracy are "in furtherance of the conspiracy" where such concealment "served not only to cover up the declarants' past participation in criminal behavior, but to shield the ongoing conspiracy as well"), *cert. denied,* 479 U.S. 1064, 107 S.Ct. 949, 93 L.Ed.2d 998 (1987); *Ruby Dev. Corp. v. Charrim Dev. Corp.,* 742 F.Supp. 1213, 1217 (E.D.N.Y.1990) (footnote omitted) (allegations of concealment on the part of the RICO defendant do not "constitute a basis for establishing an open-ended scheme or threat of repetition to satisfy the continuity requirement. Otherwise every past act of wrongdoing which a wrongdoer attempts to conceal might be the basis for finding continuity.").[17]

2. *The "Last Injury"*

■ Davis argues that the relevant "last injury" occurred sometime after December 1988, when defendants disposed of his property (some or all of the tow trucks),[18] not in April 1986, when the vehicles were seized from his place of business. It is true that, under *Keystone,* a RICO cause of action may be revived when "further injury" occurs within the limitation period; however, "further injury" under *Keystone* "means a new and distinct injury from the initial injury." *Glessner v. Kenny,* 952 F.2d 702, 708 (3d Cir.1991). In *Glessner,* plaintiffs argued that although they began having problems with their allegedly defective furnace units outside the RICO limitations period, they experienced "further injury" when their furnaces needed replacement within the limitations period. The court rejected this argument, noting that while the cost of replacement "may be an element of damage, the mere continuation of damages into a later period will not serve to extend the statute of limitations." *Id.* The injury to Davis in the case at bar was loss of use of his trucks, and the subsequent disposal of the trucks appears to be nothing more than a continuation of that injury. Even insofar as the disposal of Davis' property can be distinguished from its seizure, the particular injury resulting from its disposal did not flow from Operation Carrus' predicate acts but from Davis' voluntary relinquishment of title as a condition of his entry into PTI.[19] *See Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 497, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985) (valid RICO injury must stem from "predicate acts" that underlie the section 1962 violation). Therefore, the disposal of Davis' property—a result of his indictment and ensuing PTI negotiations with his prosecutors (who were not named as RICO defendants)—was, even if a distinct injury to Davis, not a RICO injury at all.

### III.

#### *The Section 1983 Malicious Prosecution Claims*

■ The complaint asserts claims of malicious prosecution, conspiracy to maliciously

17. Even if the alleged prosecutorial manipulation shielded an ongoing RICO conspiracy, the prosecutors who handled the case against Davis—Gurak and Waldron—are not charged as members of any RICO conspiracy; therefore, the unspoken claim must be that some or all of the RICO defendants conspired with Gurak and/or Waldron to cover up the sting operation. However, this silent allegation of a subsidiary conspiracy to conceal defendants' illegal acts is not sufficient to withstand dismissal in the absence of "supportive factual allegations" elsewhere in the complaint. *Rose v. Bartle,* 871 F.2d 331, 366 (3d Cir.1989).

18. The complaint does not indicate precisely when or how defendants disposed of Davis' property, nor exactly what property was disposed of. Because the disposal of Davis' property does not, in any event, affect the date of accrual of Davis' RICO claims, *see infra,* nothing turns on resolution of these ambiguities.

19. In ordering Davis' admission to PTI, the New Jersey Superior Court cited as a reason for that decision that "[i]n reliance on the State's announced decision to admit him to PTI, [Davis] undertook, in apparent good faith, to fulfill the conditions negotiated by the [Deputy Attorney General] and defense counsel." 581 A.2d at 1340.

prosecute, and malicious denial of PTI.[20] Plaintiff contends that the district court erred in finding that (1) the three prosecutors—Brody, Gurak and Waldron—were absolutely immune from these malicious prosecution claims, and (2) the New Jersey detective—Grusemeyer—was similarly immune.[21]

### 1. Immunity of the Prosecutors

In *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), the Court held that prosecutors sued for malicious prosecution under section 1983 enjoy absolute immunity for their conduct in "initiating a prosecution and in presenting the State's case," *id.* at 431, 96 S.Ct. at 995, because those activities are "intimately associated with the judicial phase of the criminal process," *id.* at 430, 96 S.Ct. at 994.[22] By contrast, the Court recently refused to extend absolute immunity to a prosecutor for duties that cast him in the role of an administrator or investigative officer (such as giving legal advice to police officers as to whether it is legal to arrest a suspect). *See Burns v. Reed,* —— U.S. ——, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991). Davis argues that the decision by Gurak and Waldron to deny him admission to PTI was purely administrative and therefore not properly within the absolute immunity carved out by *Imbler*.[23]

PTI is "an alternative to prosecution." N.J.Stat.Ann. §§ 2C:43–12(a)(2) (West 1992). It is "designed to divert certain individuals from the ordinary course of prosecution into programs which provide rehabilitative services and supervisory treatment." *Lindes v. Sutter,* 621 F.Supp. 1197, 1200 (D.N.J.1985). Application to PTI can only be made after the investigative phase of the criminal action

**20.** The district court properly treated these claims as various forms of a malicious prosecution claim for purposes of determining whether the various defendants were entitled to immunity therefrom. *See Rose v. Bartle,* 871 F.2d 331, 347 (3d Cir.1989) (engaging in a conspiracy to maliciously prosecute does not affect prosecutor's absolute immunity from liability for the damages resulting from the malicious prosecution).

**21.** The district court found that claims of malicious prosecution against Yingling, the federal agent, were insufficiently pled, and plaintiff does not dispute this conclusion.

**22.** The Court's rationale was as follows:

A prosecutor is duty bound to exercise his best judgment both in deciding which suits to bring and in conducting them in court. The public trust of the prosecutor's office would suffer if he were constrained in making every decision by the consequences in terms of his own potential liability in a suit for damages.

*Imbler,* 424 U.S. at 424–25, 96 S.Ct. at 992. Davis apparently recognizes that the decisions by Gurak and Waldron to issue a superseding indictment and Gurak's conduct at trial fall within this core prosecutorial immunity.

**23.** Defendant Brody, also a prosecutor within the Division of Criminal Justice, was not named in the claim of malicious interference with admission to PTI. However, Brody was accused generally of maliciously prosecuting, and conspiring to maliciously prosecute, Davis; and Davis argues that the district court erred in dismissing these claims as to Brody. The complaint describes Brody as a legal adviser to JJD Enterprises, not as exercising direct responsibility for

Davis' subsequent prosecution. (Brody is mentioned only once in connection with the earliest phases of the prosecution, as having set up a June 1986 meeting—attended by Davis, Grusemeyer and Yingling—in which Davis explained the events surrounding the delivery of the 1984 Seville.) Addressing Brody's alleged role in giving advice to the police, the district court acknowledged that, under *Burns, supra,* a prosecutor is not absolutely immune from liability for giving such advice. However, the district court noted that at issue were allegations of malicious *prosecution*—not malicious *investigation*—and "[a]ny actions by Brody, including giving advice to Grusemeyer during Operation Carrus, were not part of the prosecution." App. at 113 (footnote omitted). The district court went on to dismiss the malicious prosecution elements of the section 1983 claim against Brody based on absolute immunity, where instead—having noted that Brody's actions were not connected to Davis' prosecution—it might have dismissed for failure to state a claim upon which relief could be granted. Davis contends that the complaint does link Brody's advice and the subsequent prosecution by alleging that Brody, along with Grusemeyer, agreed to transport and dismantle the 1985 Seville, "which automobile was the basis for the investigation against plaintiff." App. at 28 (Complaint, Count IV, ¶ 5). A section 1983 malicious prosecution claim requires that the defendant "initiate" a criminal proceeding that ends in plaintiff's favor. *Rose v. Bartle,* 871 F.2d 331, 349 (3d Cir.1989). The claim that Brody had some role in obtaining the parts that led to Davis' arrest, or that he supplied general advice to JJD Enterprises, falls far short of stating a claim that, by that conduct, Brody "initiated" criminal proceedings against Davis. Therefore, the malicious

has been completed and formal criminal charges have been entered. § 2C:43–12(e). Upon application of the indictee, and with the written recommendation of the PTI program director and the consent of the prosecutor,[24] the judge may order admission to PTI. If a PTI program director recommends against enrollment or a prosecutor withholds consent, the applicant may challenge that decision by motion to the judge designated to deal with PTI matters, and the judge may order the applicant's admission to PTI program without prosecutorial consent. § 2C:43–12(d). Upon successful completion of the PTI program, and with the consent of the prosecutor, the judge may order that the indictment be dismissed.[25]

 Much like the decision whether to bring a criminal suit, which is squarely within a prosecutor's absolute immunity, see, e.g., *Malley v. Briggs,* 475 U.S. 335, 343, 106 S.Ct. 1092, 1097, 89 L.Ed.2d 271 (1986) (footnote omitted) ("[W]e shield the prosecutor seeking an indictment because any lesser immunity could impair the performance of a central actor in the judicial process."), the decision whether to continue a prosecution through to trial is at the heart of the prosecutorial decisionmaking process and should not be chilled by fear of civil sanction.

A prosecutor often must decide ... whether to proceed to trial where there is sharp conflict in the evidence. The appropriate course of action in such a case may well be to permit a jury to resolve the conflict. Yet, a prosecutor understandably would be reluctant to go forward with a close case where an acquittal likely would trigger a suit against him for damages.

*Imbler,* 424 U.S. at 426 n. 24, 96 S.Ct. at 993 n. 24. Accordingly, a prosecutor's decision whether to dispose of a case by plea—because dependent on delicate judgments affecting the course of a prosecution—is protected by the doctrine of absolute prosecutorial immunity. See *Taylor v. Kavanagh,* 640 F.2d 450, 453 (2d Cir.1981); see also *Powers v. Coe,* 728 F.2d 97, 104 (2d Cir.1984) (extending *Taylor* to an alleged breach of a prosecutor's promise not to prosecute); accord *Pfeiffer v. Hartford Fire Ins. Co.,* 929 F.2d 1484, 1492 (10th Cir.1991) (absolute immunity attaches to plea bargaining activity "due to its intimate association with the judicial process"). The decision whether to divert an indictee from trial into PTI is also a critical component of a prosecutor's function requiring an exercise of judgment similar to the decision whether to negotiate a guilty plea. As in the context of plea negotiations,[26] opening the civil courts to dissatisfied PTI applicants poses a risk of harassing liti-

---

prosecution claims against Brody were properly dismissed.

**24.** Prosecutors and program directors are supposed to consider a wide range criteria in formulating their PTI recommendations, including the nature of the offense, the age and character of the defendant, and the needs of the victim and society. See § 2C:43–12(e).

**25.** The courts which have considered the issue have determined that dismissal of an indictment because of successful completion of a PTI program is *not* a termination favorable to the accused for purposes of bringing a lawsuit for malicious prosecution. See *Lindes,* 621 F.Supp. at 1201 (completion of PTI does not constitute the favorable termination necessary to maintain either a section 1983 action for malicious prosecution or a state law action for malicious prosecution); *Thomas v. New Jersey Inst. of Technology,* 178 N.J.Super. 60, 427 A.2d 1142, 1143 (1981) (successful completion of PTI is "not the equivalent of a judgment of acquittal or an otherwise favorable termination of the criminal proceeding" and is at most nondeterminative as to "guilt or innocence."); cf. *Singleton v. City of*

New York, 632 F.2d 185, 194–95 (2d Cir.1980) (finding that "adjournment in contemplation of dismissal"—the equivalent of New Jersey's PTI—could not form the basis of a section 1983 claim of malicious prosecution because it was not a favorable termination), cert. denied, 450 U.S. 920, 101 S.Ct. 1368, 67 L.Ed.2d 347 (1981); *Konon v. Fornal,* 612 F.Supp. 68, 69–71 (D.Conn.1985) (same for Connecticut's "accelerated rehabilitation law"). Because a section 1983 malicious prosecution plaintiff must show that the criminal proceedings were terminated in plaintiff's favor, see *Rose v. Bartle,* 871 F.2d 331, 349 (3d Cir. 1989), it is arguable that Davis' malicious prosecution claims fail for lack of such a demonstration. However, given our determination that the defendants are absolutely immune from Davis' malicious prosecution claims, we need not decide whether PTI is a favorable termination for purposes of asserting a section 1983 malicious prosecution claim.

**26.** "The effective negotiation of guilty pleas would be severely chilled if a prosecutor were constantly concerned with the possibility of ruinous personal liability for judgments and decisions made at this critical stage of the criminal process." *Taylor,* 640 F.2d at 453.

gation against the prosecutor that would compromise independent review of PTI applications. *Cf. Burns,* —— U.S. at ——, 111 S.Ct. at 1942 (extending absolute immunity to a prosecutor's participation in a probable cause hearing because advocating criminal action against a suspect "present[s] a substantial likelihood of vexatious litigation that might have an untoward effect on the independence of the prosecutor."). Therefore, just as the integrity of the judicial process depends on a prosecutor's ability to exercise his judgment in deciding whom to indict, *see Malley, supra,* and whether to dismiss charges pursuant to a negotiated guilty plea, *see Taylor, supra,* so a prosecutor's discretion to divert an indictee from trial into PTI is an integral part of a properly functioning judicial process. Indeed, given the judicial involvement in PTI diversion determinations—a designated judge must approve the prosecutor's grant of admission, an applicant can appeal to the judge if the prosecutor or program director refuses to consent to his admission to PTI, and the judge decides whether the charges should be dismissed after the completion of PTI [27]—the prosecutor's PTI determination has a particularly "quasi-judicial" character. *See State v. Leonardis,* 71 N.J. 85, 363 A.2d 321, 337 (1976) (characterizing the decision to admit or reject an applicant to PTI as "an exercise of quasi-judicial power"), *aff'd on rehearing,* 73 N.J. 360, 375 A.2d 607 (1977); *see also People v. Superior Court of San Mateo County,* 11 Cal.3d 59, 113 Cal.Rptr. 21, 520 P.2d 405, 410 (1974) (en banc) (diversion under California's statutory pretrial program is essentially a judicial function). Therefore, we conclude that Gurak and Waldron are entitled to absolute immunity for their actions with respect to Davis' applications to PTI.[28]

**27.** Additionally, in certain circumstances, the defendant or prosecutor can seek immediate leave to appeal from the judge's decision denying or permitting PTI enrollment, and an aggrieved defendant can always obtain review of a denial of acceptance on appeal from a judgment of conviction. *See* NEW JERSEY RULES GOVERNING CRIMINAL PRACTICE, Rule 3:28(f), (g) (adopted by the Supreme Court of New Jersey under the authority of N.J.Stat.Ann. § 2C:43–14 (West 1992)). These judicial safeguards, combined with the safeguards mentioned in the text, minimize the necessity for civil damage suits. *See Imbler,* 424 U.S. at 427, 96 S.Ct. at 993 (treating as a relevant factor in an absolute immunity determination whether there are alternative means of redressing wrongful conduct). Prosecutorial abuses with respect to PTI can be remedied immediately by the PTI judge, or at the appellate level (as happened in the case at bar), by an order of admission to PTI, notwithstanding the prosecutor's lack of consent.

**28.** Davis suggests that the defendant state prosecutors should not be afforded absolute immunity because they acted " 'outside *any* legitimate prosecutorial role.' " *Rose v. Bartle,* 871 F.2d 331, 343 (3d Cir.1989) (emphasis in original) (citation omitted); *Helstoski v. Goldstein,* 552 F.2d 564, 566 (3d Cir.1977) (declining to extend absolute immunity to a United States attorney where certain paragraphs of the complaint—alleging that the prosecutor deliberately leaked false information concerning the plaintiff in order to damage his political prospects—"aver conduct which goes beyond the proper performance of [the administrative and investigative] aspects of a prosecutor's job.") The complaint alleges that Gurak and Waldron "falsely represented" to the PTI program director that Davis was involved in continuing criminal business. App. at 19 (Complaint at ¶ 64). However, this allegation, even if true, does not establish that the prosecutors acted "outside *any* legitimate prosecutorial role." This narrow exception to the absolute immunity doctrine focuses not on the propriety of the prosecutor's acts, but on whether the acts were done "clearly outside the authority or jurisdiction of the office." *Bauers v. Heisel,* 361 F.2d 581, 591 (3d Cir.1966), *cert. denied,* 386 U.S. 1021, 87 S.Ct. 1367, 18 L.Ed.2d 457 (1967); *see also Jennings v. Shuman,* 567 F.2d 1213, 1221–22 (3d Cir.1977) (citation omitted) ("[A] prosecutor is entitled to absolute immunity 'while performing his official duties' as a officer of the court, even if, in the performance of those duties, he is motivated by a corrupt or illegal intention."). Thus, in *Helstoski, supra,* involving claims against a prosecutor who allegedly had leaked false information to the press, absolute immunity was withheld not because the information leaked by the prosecutor was inaccurate, but because the leaks necessarily occurred outside any judicial setting. *See Rose,* 871 F.2d at 346 (in discussing *Helstoski,* noting that "[t]he accuracy of the information disclosed is irrelevant in an inquiry as to whether the defendants' alleged activities were 'intimately associated with the judicial phase of the criminal process' under *Imbler*"). Concerned with a prosecutor's authority to commit the acts in question, not with how faithfully a prosecutor performs those acts, courts have repeatedly extended absolute immunity to a prosecutor who suborns perjury, or even commits perjury or falsifies evidence, so long as the acts were done as part of the prosecutor's role in the judicial system. *See Imbler,* 424 U.S. at 431 n. 34, 96 S.Ct. at 995 n. 34 (knowing use of perjured testimony at trial and suppression of evidence); *Lee v. Willins,* 617 F.2d 320, 322 (2d

### 2. *Immunity of the State Detective*

■ A separate question is whether defendant Grusemeyer, a police detective who allegedly assisted the defendant prosecutors with various investigative functions during the prosecution, is also entitled to absolute immunity for his role in the prosecution.[29] Noting that the complaint does not specify the nature of Grusemeyer's alleged involvement in the prosecution, the district court decided that, even assuming Grusemeyer engaged in ongoing investigative activities at the behest of the prosecutors, he should, because acting as the prosecutors' agent, enjoy the same immunity from malicious prosecution claims as would a prosecutor. We agree.

This court has not squarely resolved whether persons employed by a prosecutor to secure information relating to the prosecution of an accused are entitled to absolute immunity. However, we have held that "absolute immunity protects a prosecutor in the performance of investigative functions to the extent that the investigation is 'intimately associated with the judicial phase of the criminal process.'" *Black v. Bayer,* 672 F.2d 309, 320 (3d Cir.) (quoting *Ross v. Meagan,* 638 F.2d 646, 648 (3d Cir.1981), *cert. denied sub nom. Stoica v. Stewart,* 459 U.S. 916, 103 S.Ct. 230, 74 L.Ed.2d 182 (1982)).[30] Not only an attorney, but also the employee of an attorney, will be granted absolute immunity when the employee's function is closely allied to the judicial process. *Waits v. McGowan,* 516 F.2d 203, 206 (3d Cir.1975). Inspired by these two principles, this court has already determined—and reaffirmed—that an investigator employed by a public defender[31] is absolutely immune for his investigative assistance in the course of a criminal defense. *See Waits,* 516 F.2d at 207; *see also Black,* 672 F.2d at 320 (reaffirming *Waits*). The *Waits* court reached this conclusion by analogizing an investigator for a public defender to a prosecuting attorney's investigator.

An investigator directly employed by the district attorney to do a particular investigative job relating to the prosecution of an accused is not the equivalent of the ordinary police officer, who is empowered by

Cir.) (falsification of evidence and coercion of perjured testimony from trial witnesses), *cert. denied,* 449 U.S. 861, 101 S.Ct. 165, 66 L.Ed.2d 78 (1980); *Henzel v. Gerstein,* 608 F.2d 654, 657 (5th Cir.1979) (filing a baseless detainer, using perjured testimony and suppressing exculpatory evidence); *Wilkinson v. Ellis,* 484 F.Supp. 1072, 1082 (E.D.Pa.1980) (Becker, J.) (deciding that, because "perjury qua perjury" is not non-advocatory, prosecutors are absolutely immune from liability for their allegedly false statements made in several court hearings). By contrast, courts have been unwilling to extend absolute immunity to a prosecutor's alleged perjury or destruction of evidence when not closely connected to an ongoing criminal prosecution. *See Briggs v. Goodwin,* 569 F.2d 10 (D.C.Cir.1977) (although rejecting the district court's reasoning that perjury is never within a prosecutor's authority, declining to extend absolute immunity to a prosecutor's alleged perjury during a grand jury investigation that had not yet focused on a particular suspect), *cert. denied,* 437 U.S. 904, 98 S.Ct. 3089, 57 L.Ed.2d 1133 (1978); *Wilkinson,* 484 F.Supp. at 1083 (destruction of evidence by prosecutor not closely connected to the judicial process because "when evidence is disposed of, it is kept from judicial scrutiny altogether"). In the case at bar, the prosecutors' evaluation and characterization of the evidence against Davis for purposes of making a PTI determination were—unlike in *Helstoski* and *Briggs*—judgments affecting the course of an ongoing prosecution; therefore, the allegations of false representations not-

withstanding, the acts of the defendant prosecutors with respect to PTI fall under the umbrella of the absolute prosecutorial immunity.

**29.** The malicious prosecution claims against Grusemeyer concern only his activities once the prosecution ensued, not Grusemeyer's investigatory action during Operation Carrus. Davis included a separate claim directed to these initial investigative activities, which the district court dismissed as time-barred, and plaintiff does not dispute the dismissal of that malicious investigation claim.

**30.** *See also Imbler,* 424 U.S. at 431 n. 33, 96 S.Ct. at 995 n. 33 ("Preparation, both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing, and evaluation of evidence."); *Forsyth v. Kleindienst,* 599 F.2d 1203, 1215 (3d Cir.1979) ("[T]o the extent that the securing of information is necessary to a prosecutor's decision to initiate a criminal prosecution, it is encompassed within the protected, quasi-judicial immunity afforded to the decision itself."), *cert. denied sub nom. Mitchell v. Forsyth,* 453 U.S. 913, 101 S.Ct. 3147, 69 L.Ed.2d 997 (1981).

**31.** Public defenders enjoy the same absolute immunity from civil liability under § 1983 as prosecutors. *See Black,* 672 F.2d at 318–20; *Ross,* 638 F.2d at 648–49.

the state to initiate discretionary acts depriving others of their rights and whose many activities in the prevention of crime and enforcement of law need not be related to the judicial process. In the same way, an investigator of the public defender has no power to deprive anyone of his or her rights. The only function of such an investigator is to assist in the defense of the accused, a function directly related to the judicial process.

*Waits,* 516 F.2d at 207. Other Circuits have held what this court implied in *Waits:* that investigators for a prosecutor performing investigative work in connection with a criminal prosecution deserve the same absolute immunity as the prosecutor. *See Gobel v. Maricopa County,* 867 F.2d 1201, 1203 n. 5 (9th Cir.1989); *Keating v. Martin,* 638 F.2d 1121, 1122 (8th Cir.1980) (per curiam); *Atkins v. Lanning,* 556 F.2d 485, 488–89 (10th Cir.1977).[32] It may be conceivable that in certain circumstances some aspects of an investigator's work for a prosecutor, while carried out in connection with a criminal prosecution, would have so attenuated a link to the prosecution that immunity should not attach; however, in the case at bar, the gravamen of the § 1983 allegation is malicious prosecution.[33] Therefore, only that conduct of defendant Grusemeyer that is related to the pursuit of the claimed malicious prosecution is relevant to the question whether he is entitled to share in the absolute immunity that cloaks defendants Gurak and Waldron. Plaintiff relies on no other conduct.[34] Accordingly, the district court was correct in finding Grusemeyer immune from suit under § 1983.

---

**32.** Davis puts stock in the fact that Grusemeyer is not an "investigator" for the New Jersey Attorney General's Office but a "Detective" in the New Jersey State Police. "The Supreme Court has outlined a 'functional' approach to immunity issues," *Schrob v. Catterson,* 948 F.2d 1402, 1209 (3d Cir.1991) (quoting *Burns,* — U.S. at —, 111 S.Ct. at 1939), and it is inconsistent with this approach to treat as dispositive the formal label of the person performing the act, *Imbler,* 424 U.S. at 430, 96 S.Ct. at 994; *Schrob,* 948 F.2d at 1409; *Taylor,* 640 F.2d at 452. We fail to see why a police officer, insofar as that officer is performing the functions of an investigator for a prosecuting attorney during an ongoing prosecution, should enjoy a lesser immunity than a non-police investigator simply by virtue of title. Similarly, it does not affect our analysis whether a person performing prosecution-related investigation is on the payroll of the State Attorney General, so long as that person is working at the direction of a prosecuting attorney when performing the investigation. *See Gobel,* 867 F.2d at 1203 n. 5 (treating as matter of indifference whether an investigator was employed by Maricopa County or by the Maricopa County Attorney's Office).

**33.** *See supra* note 23.

**34.** *See supra* note 29.

## IV.

### *Conclusion*

Plaintiff's RICO claims are barred by the applicable four-year statute of limitations, and plaintiff's malicious prosecution claims fail due to an absolute prosecutorial immunity. Accordingly, we affirm the district court's 12(b)(6) dismissal of plaintiff's case.