**EMERSON ELECTRIC CO., et al., Plaintiffs,**

v.

**LE CARBONE LORRAINE, S.A., et al., Defendants.**

Civil Action No. 05–6042 (JBS).

United States District Court, D. New Jersey.

Aug. 9, 2007.

Daniel A. Sasse, Esq., Matthew J. McBurney, Esq., Crowell & Moring, Irvine, CA, and Jerome A. Murphy, Esq., Kent A. Gardiner, Esq., Crowell & Moring, LLP, Washington, DC, and Joel H. Serlin, Esq., Ronald L. Cornell, Jr., Esq., Seyburn, Kahn, Southfield, MI, for Plaintiffs.

Harris Neal Feldman, Esq., James Richard Costello, II, Esq., Schnader, Harrison, Segal & Lewis, LLP, Cherry Hill, NJ, and Jonathan S. Feld, Esq., Katten Muchin Rosenmann, LLP, Chicago, IL, for Defendants Le Carbone Lorraine, Carbone Lorraine North America Corp., Carbone of America Industries Corp. and Emilio Di Bernardo.

## OPINION

SIMANDLE, District Judge.

## I. BACKGROUND

This matter is before the Court on Motions to Dismiss the Amended Complaint by Defendants Le Carbone Lorraine, Carbone Lorraine North America Corp., and Carbone of America Industries Corp. [Docket Item 9] and by Emilio Di Bernar-

do [Docket Item 43]. The Court heard oral argument on April 24, 2007 and reserved decision.

Plaintiffs in this action are companies that opted out of the larger electrical carbon products anti-trust class action, which settled. *See In re: Elec. Carbon Prods. Antitrust Litig.*, 447 F.Supp.2d 389 (D.N.J. 2006). Specifically, Plaintiffs are:

1. Emerson Electric Co., a Missouri corporation with its principal place of business in Missouri;

2. Valeo, S.A., a French corporation with its principal place of business in Paris, France;

3. Valeo, Inc., a New York corporation with its principal place of business in Michigan;

4. Electrolux Home Care Products, Ltd., a Texas limited partnership [1] with its principal place of business in Illinois;

5. Delphi Corp., a Delaware corporation with its principal place of business in Michigan;

6. Robert Bosch GmbH, a German corporation with its principal place of business in Stuttgart, Germany;

7. Robert Bosch Corp., an Illinois corporation with its principal place of business in Illinois;

8. A.O. Smith Corp., a Delaware corporation with its principal place of business in Wisconsin;

9. Visteon Corp., a Delaware corporation with its principal place of business in Michigan;

10. Rockwell Automation, Inc., a Delaware corporation with its principal place of business in Wisconsin;

---

1. The docket sheet incorrectly refers to Electrolux with the "Inc." designation.

11. Baldor Electric Co., a Missouri corporation with its principal place of business in Arkansas;

12. Fasco Industries Inc., a Michigan corporation with its principal place of business in Michigan;

13. Siemens Transportation Systems Inc., a Delaware corporation with its principal place of business in California; and

14. CBS Corp., a Delaware corporation with its principal place of business in New York.[2]

(Am.Compl.¶¶ 11–24.)

The original Complaint in this action was filed September 23, 2005, in the Eastern District of Michigan. In December 2005, the case was transferred to this Court by the Judicial Panel on Multidistrict Litigation. In June 2006, Plaintiffs filed an Amended Complaint in this Court and these motions to dismiss eventually followed.

The defendants moving to dismiss the Amended Complaint ("Defendants") are the only remaining defendants who have appeared in this action. Defendant Le Carbone Lorraine ("LCL") is a French company that owns 100% of the shares of Defendant Carbone Lorraine North America. Carbone Lorraine North America is a New Jersey corporation with its principal place of business in New Jersey. Defendant Carbone of America Industries Corp. is a Michigan corporation with its principal place of business in New Jersey. It is a subsidiary of Carbone Lorraine North America. The Court shall collectively refer to these companies as "the Carbone Defendants" or "the Carbone group." According to Plaintiffs, Defendant Emilio Di Bernardo was employed by and acted as

an agent for the Carbone group and participated in their worldwide conspiracy to fix the prices of electrical carbon products sold in the United States, Europe and elsewhere. (Am.Compl.¶ 34.)

## II. ALLEGATIONS OF THE AMENDED COMPLAINT

Plaintiffs allege that between October 1988 and September 2001 Defendants engaged in a conspiracy to fix the prices of electrical carbon products, which Plaintiffs purchased at inflated, non-competitive prices in the United States, Europe and elsewhere. (Am.Compl.¶ 2). The Amended Complaint defines "electrical carbon products" as

carbon brushes, commutators, brush holders, and current collectors used in the manufacture of direct current electric motors, automotive applications and other transit applications as well as consumer, commercial and industrial products; mechanical carbon products used in pump and compressor industries; also the blocks of carbon from which these products are made.

(Id. at ¶ 10(a)). The Amended Complaint also describes some of those listed products:

Carbon brushes are used to transfer electrical current in direct current motors by acting as the rubbing contacts for electrical connectors in motors. Direct current motors are used in a variety of products including computers, consumer products, automobiles, battery-operated electric vehicles and public transit vehicles. Carbon collectors are used to transfer electrical current from wires or rails for use in transit vehicles that are not independently powered. Mechanical carbon products are sold primarily to pump seal manufacturers and

2. Although named as a plaintiff in paragraph 14 of the Amended Complaint, CBS is not listed as a party on the docket. Conversely,

Viacom, Inc. is listed as a plaintiff on the docket but is not named as a plaintiff in the Amended Complaint.

are used in fluid handling products for containing liquids in wear situations. In this Amended Complaint, the types of electrical and mechanical carbon products at issue include, but are not limited to, carbon current collectors, carbon brushes sold to original equipment manufacturers for automotive applications, traction-transit carbon brushes, industrial carbon brushes for use in battery-operated vehicles, carbon brushes sold to original equipment manufacturers for use in consumer products, commercial products and industrial applications, and mechanical carbon products for use in pump and compressor industries.

(*Id.*)

Plaintiffs bring this action pursuant to the Sherman Act, 15 U.S.C. § 1; the Clayton Act, 15 U.S.C. §§ 15 and 26; and the Michigan Antitrust Reform Act, Mich. Comp. Laws §§ 445.772, et seq. (*Id.* at ¶ 4.) Plaintiffs seek treble damages, injunctive relief and attorneys' fees.

Among other things, Plaintiffs allege that:

Defendants and their Co-conspirators conspired in a global price-fixing scheme that had the direct and substantial effect of keeping prices paid by purchasers in the United States artificially high. Price movements in each sales region were inextricably linked to all other regions so that the prices charged by Defendants and their Co-conspirators in other countries directly impacted United States prices. Defendants and their Co-conspirators fixed prices and allocated or controlled customers in the United States not merely to capture cartel profits in the United States, but also to allow the cartel to be effective anywhere in the world. Defendants and their Co-conspirators knew that their conspiracy would not succeed unless they coordinat-ed their prices and market shares throughout the world.

(Am.Compl.¶ 72). Plaintiffs include foreign and domestic companies that bought electrical carbon products in the United States as well as those who purchased abroad.

Plaintiffs also allege more specific domestic conduct that they claim caused foreign injury. For example, Plaintiffs claim defendants manipulated the prices of raw materials in the United States. (*Id.* at ¶ 79). Those raw materials were converted into products that were sold in Europe with inflated prices. (*Id.*) In addition, Plaintiffs allege that the defendants participated in a conspiracy for Morgan Crucible to purchase an American competitor, raise that competitor's prices to the cartel prices, and frustrate international competition and cause domestic as well as foreign antitrust injury by preventing both domestic and foreign Plaintiffs from purchasing at fair prices. (*Id.* at ¶ 80).

Plaintiffs also claim that defendants fraudulently concealed their conduct and that the statute of limitations on their claims was tolled until November 4, 2002, when the Department of Justice announced that Morganite (no longer a defendant in this action) had pled guilty to charges of price fixing and obstruction of justice in connection with the electrical carbon products industry. (*Id.* at ¶¶ 107–11).

## III. MOTION TO DISMISS BY CARBONE DEFENDANTS

### A. Subject Matter Jurisdiction Over Injuries Arising From Foreign Purchases

Plaintiffs' first cause of action is a claim that Defendants violated Section 1 of the Sherman Act, 15 U.S.C. § 1. (Am. Compl.¶¶ 113–17). By incorporating the

allegations of the rest of the Complaint (*id.* at ¶ 113), Plaintiffs are seeking damages under that Act for purchases they made in the United States and in other countries. The Carbone Defendants argue that this Court does not have subject matter jurisdiction under the Sherman Act to hear Plaintiffs' claims of injury from purchases that occurred outside the United States.[3] Plaintiffs oppose, arguing that this Court has subject matter jurisdiction over all of their antitrust damages, including those damages arising from foreign purchases. (Pl.'s Br. Opp. Carbone [4] at 6–21.)

Because it is a challenge to the Court's subject matter jurisdiction, this motion is appropriately considered a Rule 12(b)(1) motion. *CSR Ltd. v. CIGNA Corp.*, 405 F.Supp.2d 526 (D.N.J.2005). Further, because this attack on subject matter jurisdiction is a "facial" attack, the Court must take all the facts alleged in the Amended Complaint as true and decide whether the Court has jurisdiction. *See Turicentro, S.A. v. American Airlines*, 303 F.3d 293, 300 n. 4 (3d Cir.2002) (explaining difference between facial and factual attacks on subject matter jurisdiction).

Although the parties have submitted additional exhibits, Defendants conceded at oral argument that this is a facial attack and that the Court must accept as true the facts alleged in the Amended Complaint. Therefore, the Court will look only to the allegations in the Amended Complaint and will not consider these additional exhibits. Nor will the Court convert these motions to dismiss into motions for summary judgment, as Rule 12(b) permits, because these motions were filed in lieu of Answers, shortly after the Amended Complaint was served and likely before any substantial discovery occurred. *See Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 893 n. 18 (3d Cir.1977) ("In *Doctors, Inc. v. Blue Cross*, 490 F.2d 48 (3d Cir. 1973), [a Sherman Act case,] the defendant had filed a 12(b)(1) motion prior to filing an answer, so plaintiffs' jurisdictional allegations were entitled to a presumption of truthfulness.")

The Supreme Court has noted that this Court's jurisdiction is limited:

> Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute, *see Willy v. Coastal Corp.*, 503 U.S. 131, 136–137, 112 S.Ct. 1076, 117 L.Ed.2d 280(1992); *Bender v. Williamsport Area School Dist.*, 475 U.S. 534, 541, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986), which is not to be expanded by judicial decree, *American Fire & Casualty Co. v. Finn*, 341 U.S. 6, 71 S.Ct. 534, 95 L.Ed. 702 (1951). It is to be presumed that a cause lies outside this limited jurisdiction, *Turner v. Bank of North America*, 4 U.S. 8, 4 Dall. 8, 1 L.Ed. 718 (1799), and the burden of establishing the contrary rests upon the party asserting jurisdiction, *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 182–183, 56 S.Ct. 780, 80 L.Ed. 1135 (1936).

*Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994).

Whether this Court has jurisdiction over the foreign injuries of Plaintiffs turns on the application of the Foreign Trade Antitrust Improvements Act ("FTAIA") [5], which says the Sherman Act:

---

**3.** Although not a feature of his brief, Defendant Di Bernardo joins in this argument. (Di Bernardo Br. at 15.)

**4.** Pl.'s Br. Opp. Carbone refers to the brief filed in opposition to the Carbone Defendants' motion to dismiss.

**5.** The parties agree that the FTAIA applies because Plaintiffs allege harm from "conduct

shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless—

(1) such conduct has a direct, substantial, and reasonably foreseeable effect—

 (A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or

 (B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and

(2) such effect gives rise to a claim under the provisions of this Act, other than this section.

If this Act applies to such conduct only because of the operation of paragraph (1)(B), then this Act shall apply to such conduct only for injury to export business in the United States.

15 U.S.C. § 6a. In other words, the FTAIA

excludes from the Sherman Act's reach much anticompetitive conduct that causes only foreign injury. It does so by setting forth a general rule stating that the Sherman Act "shall not apply to conduct involving trade or commerce ... with foreign nations." It then creates exceptions to the general rule, applicable where (roughly speaking) that conduct significantly harms imports, domestic commerce, or American exporters.

*F. Hoffmann–La Roche Ltd. v. Empagran S.A.,* 542 U.S. 155, 158, 124 S.Ct. 2359, 159 L.Ed.2d 226 (2004) (citation omitted) ("hereinafter *Empagran* ").

This technical language initially lays down a general rule placing all (non-import) activity involving foreign com-

merce outside the Sherman Act's reach. It then brings such conduct back within the Sherman Act's reach provided that the conduct both (1) sufficiently affects American commerce, i.e., it has a "direct, substantial, and reasonably foreseeable effect" on American domestic, import, or (certain) export commerce, and (2) has an effect of a kind that antitrust law considers harmful, i.e., the "effect" must "giv[e] rise to a [Sherman Act] claim." §§ 6a(1), (2).

*Id.* at 162, 124 S.Ct. 2359.

Moreover, for a court to have jurisdiction over Plaintiffs' claims involving foreign conduct, not only must the conduct at issue sufficiently affect American commerce and have effects that give rise to a Sherman Act claim, but those effects must also give rise to *Plaintiffs* ' Sherman Act claim raised in the instant case. *See id.* at 174, 124 S.Ct. 2359 (reading "a claim" in FTAIA to mean "the 'plaintiff's claim' or 'the claim at issue' "). That is to say, it is not sufficient that a theoretical plaintiff injured in the United States by the conduct at issue might have a Sherman Act claim. Rather, the foreign anticompetitive conduct must have domestic effects that give rise to Plaintiffs' Sherman Act claim in this case. If the anticompetitive conduct gives rise to foreign harm to Plaintiffs as well as domestic effects that create a Sherman Act violation unrelated to Plaintiffs, that will not suffice. *See id.* at 159, 124 S.Ct. 2359 ("the exception does not apply where the plaintiff's claim rests solely on the independent foreign harm.").

In *Empagran,* the United States Supreme Court held that insofar as foreign purchasers alleged that (1) they are harmed by inflated foreign prices and (2) such harm is independent of any domestic

---

involving trade or commerce ... with foreign nations," that is, purchases of electrical car-

bon products outside the United States. 15 U.S.C. § 6a.

antitrust injury, the Sherman Act does not provide a remedy. The Court explained that it was "focus[ing] upon anticompetitive price-fixing activity that is in significant part foreign, that causes some domestic antitrust injury, and that independently causes separate foreign injury." 542 U.S. at 158, 124 S.Ct. 2359. The Court held that (1) such price-fixing conduct and the foreign injury that it causes falls within the FTAIA's general rule excluding the Sherman Act's application because it is " 'conduct involving trade or commerce . . . with foreign nations' "; and (2) the conduct does not fall within the domestic-injury exception where the plaintiff's claim rests solely on independent foreign harm. *Id.* at 159, 124 S.Ct. 2359.

However, the Supreme Court remanded to the Circuit Court to decide a more closely-poised issue: whether the foreign purchasers would have a Sherman Act claim if the foreign injury were dependent on domestic price-fixing and injury.

We have assumed that the anticompetitive conduct here independently caused foreign injury; that is, the conduct's domestic effects did not help to bring about that foreign injury. Respondents argue, in the alternative, that the foreign injury was not independent. Rather, they say, the anticompetitive conduct's domestic effects were linked to that foreign harm. Respondents contend that, because vitamins are fungible and readily transportable, without an adverse domestic effect (i.e., higher prices in the United States), the sellers could not have maintained their international price-fixing arrangement and respondents would not have suffered their foreign injury. They add that this "but for" condition is sufficient to bring the price-fixing conduct within the scope of the FTAIA's exception.

The Court of Appeals, however, did not address this argument, 315 F.3d at 341, and, for that reason, neither shall we. *Empagran,* 542 U.S. at 175, 124 S.Ct. 2359. Defendants argue that this is the factual scenario Plaintiffs allege in this action and the issue this Court must decide [6] on these motions to dismiss. Defendants claim every court faced with this "arbitrage theory" since *Empagran* has rejected it. (Carbone Br. at 11–12). The Court of Appeals for the Third Circuit has not yet addressed the arbitrage theory.

However, Plaintiffs claim that they allege more than the arbitrage theory contemplates. Plaintiffs claim that the arbitrage theory was an attempt to circumvent *Empagran* "by simply pleading that the success of the cartel in one part of the world was dependent on fixing prices elsewhere in the world." (Pl.'s Br. Opp. Car-

---

**6.** On remand, the D.C. Circuit rejected the viability of this theory. *Empagran S.A. v. F. Hoffmann–LaRoche, Ltd.,* 417 F.3d 1267 (D.C.Cir.2005), *cert. denied,* 546 U.S. 1092, 126 S.Ct. 1043, 163 L.Ed.2d 857 (2006). Holding that there could be no jurisdiction over foreign injuries unless domestic conduct was the proximate cause of that harm, the Court found insufficient the allegation of a single global market.

The appellants paint a plausible scenario under which maintaining super-competitive prices in the United States might well have been a "but-for" cause of the appellants' foreign injury. As the appellants acknowl-

edged at oral argument, however, "but-for" causation between the domestic effects and the foreign injury claim is simply not sufficient to bring anti-competitive conduct within the FTAIA exception. The statutory language-"gives rise to"-indicates a direct causal relationship, that is, proximate causation, and is not satisfied by the mere but-for "nexus" the appellants advanced in their brief.

*Id.* at 1270–71. The Third Circuit has not decided the viability of the global cartel theory or the level of connection a plaintiff must allege between American effects and foreign injury.

bone at 12–13). Plaintiffs argue that they do not merely allege the "but-for" causation involved in the arbitrage theory. (*See id.* at 14–21). Rather, Plaintiffs argue, without citing to the Amended Complaint that:

Unlike the foreign plaintiffs in *Empagran II*, the Global Plaintiffs [here] are multinational corporations, with unitary purchasing organizations, that have headquarters and/or significant operations located in the U.S. Negotiations for and purchases of products (including Electrical Carbon Products), are generally made for each Global Plaintiff at a global level by a single purchasing unit at each company. This structure allows each purchasing unit to shop for the best price available worldwide (including in the U.S.) and then ship the acquired products to all of the Global Plaintiff's international locations (including the U.S.)

[E]ach member of the cartel adjusted its behavior to approach the Global Plaintiffs on an international basis with a uniform price. Each did this by taking special steps to assure that the prices it charged these corporations were artificially inflated worldwide, frequently using international subsidiaries (including those in the U.S.) to raise prices. The result was . . . . (a) each Global Plaintiff essentially paid a single price for Electrical Carbon Products across all of its global locations, including those located in the U.S.; and (b) a cartel member's illegal price increases *simultaneously* affected the Global Plaintiff's facilities in the U.S. and abroad.

(Pl.'s Br. Opp. Carbone at 15.)

Those allegations simply do not appear in the Amended Complaint. Indeed, Plaintiffs' imprecise language seems to account for that; for example, Plaintiffs allege, *"Essentially, it is as if* each Global Plaintiff negotiated a single contract for the supply of Electrical Carbon Products to all of its U.S. and foreign operations from a single supplier (the cartel), at a single price." (*Id.* at 16) (emphasis added); (*see also* Carbone Reply at 2)(noting that these allegations were not pleaded). Plaintiffs come close to describing this kind of arrangement when they allege that:

Plaintiffs Emerson, Delphi, Rockwell, Visteon and the Bosch and Valeo Plaintiffs (collectively, the "Global Plaintiffs") are multinational corporations that each separately procure Electrical Carbon Products worldwide through their own integrated purchasing operations. During the Cartel Period, Defendants and their Co-conspirators singled out the Global Plaintiffs and other similarly situated companies by devising a unique global approach to fixing the prices of Electrical Carbon Products offered to the Global Plaintiffs. This approach assured that worldwide pricing for the Global Plaintiffs was centrally managed and coordinated.

(Am.Compl.¶ 76). However, this is merely a complex description of the arbitrage theory, which Plaintiffs describe more clearly in the subsequent paragraph of the Amended Complaint: "if the cartel did not act to assure that prices in one area of the globe were no less expensive . . . than those in another area, the Global Plaintiffs would have been able to purchase their . . . Electrical Carbon Products in [the less-expensive] area [, thereby] damaging . . . the cartel's stability and profitability." (Am.Compl.¶ 77). This pleads only the but-for causation that other courts have rejected as a basis for subject matter jurisdiction over claims related to foreign commerce.

In addition, Plaintiffs argue that because they have domestic antitrust claims over

which the Court clearly has jurisdiction, they should also be able to bring their foreign claims. (Pl.'s Br. Opp. Carbone at 17–19.) This claim has no merit.

■ By making arguments about allegations not in the Amended Complaint, Plaintiffs fail to address the Carbone group's claims that the Court lacks subject matter jurisdiction over the foreign injury that *is* alleged in the Amended Complaint. This Court agrees with the other courts that have held there is no FTAIA jurisdiction over foreign purchases when the alleged connection to domestic commerce is that the foreign injury would not have occurred if American prices were competitive. Because Plaintiffs in this case merely allege that tenuous connection, the arbitrage theory, the Court does not have jurisdiction over claims arising out of Plaintiffs' foreign purchases.

Even if the allegations described in Plaintiffs' brief were in the Amended Complaint, the Court would still lack jurisdiction over them because there is no claim that the foreign purchases directly affected domestic commerce or American import or export commerce, as the statute requires. 15 U.S.C. § 6a. Further, the fact that Plaintiffs may be American companies or have locations in the United States is not relevant to the subject matter jurisdiction inquiry under the FTAIA, *Turicentro*, 303 F.3d at 301, unless they were claiming injury as American exporters, 15 U.S.C. § 6a(1)(B), which they are not. Therefore, the Court lacks jurisdiction over Plaintiffs' claims related to foreign purchases and shall grant Defendants' motion to dismiss those claims.[7]

## B. Statute of Limitations and Fraudulent Concealment

Defendants argue that statutes of limitations preclude Plaintiffs' pre-November 1998 claims, Michigan claims and claims involving "newly-added products." (Car-

bone Reply Br. at 9, Carbone Br. at 13–26). Plaintiffs respond that all relevant statutes of limitations were tolled by (1) Defendants' fraudulent concealment and (2) the related class action from which Plaintiffs opted out. Because it appears that Plaintiffs have sufficiently alleged fraudulent concealment, and because tolling for fraudulent concealment would make the federal claims timely, the Court shall deny the motion to dismiss the federal claims on statute of limitations grounds, as explained below.

However, because the Michigan tolling provision is more restrictive than the federal one, fraudulent concealment does not save the Michigan claims. As explained below, the federal class action did not toll the Michigan claims; therefore, the Court shall grant the motion to dismiss those claims.

### 1. *Federal Claim*

Plaintiffs seek to recover treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15 (Am.Compl.¶ 4) for Defendants' alleged violation of federal antitrust laws. Because Plaintiffs allege some harm from conduct over which this Court does have jurisdiction, notwithstanding the Court's ruling above, it is appropriate for the Court to consider whether a statute of limitations bars Plaintiffs' recovery under the Clayton Act for claims arising prior to November 15, 1998, as the Carbone group argues. (Carbone Br. at 13).

The Clayton Act provides, in relevant part

> any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and

---

7. Because the Court is dismissing claims related to purchases abroad, the Court will not decide whether it has personal jurisdiction over Defendant Le Carbone Lorraine; it ap-

pears that all claims against Le Carbone Lorraine are dismissed for lack of subject matter jurisdiction under the FTAIA.

the cost of suit, including a reasonable attorney's fee.

15 U.S.C. § 15(a). Under 15 U.S.C. § 15b, such private action for damages must be brought "within four years after the cause of action accrued," unless the statute of limitations should be tolled for some reason. *Zenith Radio Corp. v. Hazeltine Research,* 401 U.S. 321, 338, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971) ("The basic rule is that damages are recoverable under the federal antitrust acts only if suit therefor is 'commenced within four years after the cause of action accrued,' 15 U.S.C. § 15b, plus any additional number of years during which the statute of limitations was tolled.").

■■■ As this Court explained when denying a similar motion to dismiss in the larger electrical carbon products class action, *In re: Elec. Carbon Prods. Antitrust Litig.,* 333 F.Supp.2d 303, 315 (D.N.J. 2004), "The tolling of the statute of limitations due to 'fraudulent concealment' is an 'equitable doctrine [that] is read into every federal statute of limitations.' " (quoting *Holmberg v. Armbrecht,* 327 U.S. 392, 397, 66 S.Ct. 582, 90 L.Ed. 743 (1946)) (alteration in *In re: Elec. Carbon Prods.*). If a plaintiff can establish that a defendant fraudulently concealed its actions such that the plaintiff could not know of its injury during the limitations period, the Court shall toll the statute of limitations during that term of concealment. *In re: Elec. Carbon Prods.,* 333 F.Supp.2d at 315. "Where fraudulent concealment of a federal anti-trust claim has been shown by a plaintiff, the four-year federal statute of limitations begins anew from the time the plaintiff knew or should have known of the existence of the federal claim." *State of Mich. ex rel. Kelley v. McDonald Dairy Co.,* 905 F.Supp. 447, 451 (W.D.Mich.1995) (citing *Norton–Children's Hospitals v.*

*James E. Smith & Sons, Inc.,* 658 F.2d 440, 445 (6th Cir.1981)).

■■■ To establish this tolling, the plaintiff must show:

1. an affirmative act of concealment by each defendant,

2. that the defendant's actions misled the plaintiff or relaxed its inquiry, and

3. that the plaintiff exercised due diligence during the statutory period.

*In re Lower Lake Erie Iron Ore Antitrust Litig.,* 998 F.2d 1144, 1178–79 (3d Cir.1993). On a motion to dismiss, the relevant inquiries are two-fold; first, the Court must determine whether, accepting the allegations in the Complaint as true, the plaintiffs have stated a claim for fraudulent concealment, *see Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), and second, the Court must determine whether the plaintiffs have alleged underlying acts of fraudulent concealment with particularity as required by the heightened pleading standard for fraud claims provided by Rule 9(b), Fed.R.Civ.P., *see Byrnes v. DeBolt Transfer, Inc.,* 741 F.2d 620, 626 (3d Cir.1984).

*In re Elec. Carbon Prods. Antitrust Litig.,* 333 F.Supp.2d at 315. However, "[w]hen a Clayton Act conspiracy is involved, the plaintiff must allege 'active concealment' by [only] one defendant in the conspiracy, as such an act can, if the conspiracy is established, be attributed to the other members of the conspiracy." *Id.* at 315–16 (citing *Davis v. Grusemeyer,* 996 F.2d 617, 624 (3d Cir.1993)).

The allegations that the Court found sufficient to state a claim for fraudulent concealment in the class action complaint are extremely similar to the allegations in the Amended Complaint here. The class plaintiffs alleged injury beginning in 1990 while Plaintiffs in this action allege injury

beginning in 1988. In both cases, however, the date of injury was "determined, in part, by the European Commission's finding that the 'secret cartel' existed .... between October 1988 and December 1999." *In re Elec. Carbon Prods. Antitrust Litig.*, 333 F.Supp.2d at 316. As in the related case, the plaintiffs in this case "have alleged that there were no 'suspicious circumstances' or 'storm warnings' that would have alerted them to the possibility of fraud until the November 4, 2002 guilty pleas of Morganite and Morgan Crucible, meaning that their responsibility to investigate the fraud was not triggered until that date." *Id.* at 317; (*see* Am. Compl. ¶ 107). Plaintiffs here allege additional acts of concealment. Citing the European Commission report, Plaintiffs note that Defendants and their co-conspirators concealed their conspiracy by using code names, sending correspondence to post boxes, staggering price changes to create the appearance that they made decisions independently and camouflaging price increases as charges for services performed. (*Compare* Am. Compl. ¶ 109 *with* Third Am. Compl. in 03–2182 ¶¶ 72, 75).

█ However, the Carbone Defendants were not participants in the motion to dismiss in the prior case. Therefore, they are not bound by that decision. Further, the Carbone defendants allege that as of 2000, at the latest, there were three sources of "storm warnings" indicating that Plaintiffs should investigate whether they might have claims against the Carbone defendants. First, the Carbone Defendants allege that in their 1999 annual report they disclosed the Justice Department's investigation into a separate market, the American graphite products industry. Second, the Carbone Defendants allege that in 2000 Defendants Carbone of America Industries and Michel Coniglio [8] entered guilty pleas, but do not indicate that those pleas were related to the electrical carbon products industry. Third, the Carbone Defendants allege that, also in 2000, the United States Justice Department issued a press release regarding the cooperation of Carbone of America Industries Corp. and Coniglio. However, as explained above, on this motion to dismiss the Court cannot credit these assertions, made in Carbone's briefs, over the allegations in the Amended Complaint. Moreover, the "storm warnings" of a separate conspiracy should not have triggered a heightened obligation on Plaintiffs' part to investigate whether a similar conspiracy existed in the electrical carbon products industry.

If the statute of limitations is tolled until November 2002, when Plaintiffs allege they learned of the conspiracy, then claims brought within four years of that date would be timely. The Amended Complaint was filed in June 2006 and would, therefore, be timely.[9]

---

**8.** According to Plaintiffs, Defendant Michel Coniglio, who has not appeared in this matter:

> simultaneously held executive-level positions in Defendants LCL and Carbone of America during the Relevant Period. On behalf of Defendant LCL, Mr. Coniglio served as Vice–President of the Advanced Materials and Technologies Division, Vice–President of North America and South America and as a member of the Company's Executive Committee. At the same time, Mr. Coniglio served as President and Chief Executive Officer of Carbone of America. During the Relevant Period, Mr. Coniglio was employed by and acted as an agent for LCL and Carbone of America, during which time Mr. Coniglio participated in the worldwide conspiracy to fix prices of Electrical Carbon Products sold in the United States.

(Am.Compl.¶ 30).

**9.** In addition, Plaintiffs argue that the filing of the class action complaint tolled this action. Although this appears to be true, it also appears irrelevant because the claims were filed

As in the multidistrict litigation, Plaintiffs have sufficiently pled fraudulent concealment to survive this motion to dismiss.[10] As the Court explained in that class case,

> Plaintiffs will have to prove these allegations in order to toll the statute of limitations, but for purposes of this motion, accepting them as true, the plaintiffs have properly alleged due diligence and have provided a specific factual basis for their allegation. Whether evidence of "suspicious circumstances" or "storm warnings" emerge during the course of discovery in this case remains to be seen.

> Therefore, this Court will deny the defendants' motion to the extent that they seek more particular pleading of the fraudulent concealment claims.

*Id.* at 317–18. Thus, the parties are free to argue the issue again with a more fully developed record on a motion for summary judgment.

### 2. *Michigan Claim*

Plaintiffs' second cause of action is a claim that Defendants violated §§ 445.772 and 445.778 of the Michigan Antitrust Reform Act. (Am.Compl.¶ 119). Section 445.772 provides "A contract, combination, or conspiracy between 2 or more persons in restraint of, or to monopolize, trade or commerce in a relevant market is unlawful." Mich. Comp. Laws § 445.772. Section 445.778 provides, in relevant part:

> Any [private] person threatened with injury or injured directly or indirectly in his or her business or property by a violation of this act may bring an action

for appropriate injunctive or other equitable relief against immediate irreparable harm, actual damages sustained by reason of a violation of this act, and, as determined by the court, interest on the damages from the date of the complaint, taxable costs, and reasonable attorney's fees. If the trier of fact finds that the violation is flagrant, it may increase recovery to an amount not in excess of 3 times the actual damages sustained by reason of a violation of this act.

Mich. Comp. Laws § 445.778(2). As under federal law, actions for damages under this provision have a four-year statute of limitations. Mich. Comp. Laws § 445.781(2).

Michigan law also extends the period of limitations when defendants fraudulently conceal their conduct; however, unlike federal law, Michigan law does not truly toll the statute of limitations, but rather requires suit within two years of discovery of the concealed claim:

> If a person who is or may be liable for any claim fraudulently conceals the existence of the claim or the identity of any person who is liable for the claim from the knowledge of the person entitled to sue on the claim, the action may be commenced at any time within 2 years after the person who is entitled to bring the action discovers, or should have discovered, the existence of the claim or the identity of the person who is liable for the claim, although the action would otherwise be barred by the period of limitations.

Mich. Comp. Laws § 600.5855.

Nevertheless, Plaintiffs argue that their delay in asserting state law claims is fur-

---

within four years of November 2002 and the Plaintiffs have stated a claim for fraudulent concealment until that date, as discussed below. Therefore, the Court need not address whether Plaintiffs assert claims as to new products that were not asserted in and not tolled by the class action.

**10.** Because Plaintiffs have adequately pled that Defendant Di Bernardo was a member of the conspiracy, the Court will also toll the statute of limitations on claims against him for fraudulent concealment until November 2002. *See Davis v. Grusemeyer*, 996 F.2d 617, 624 (3d Cir.1993).

ther excused by the federal class action which, they argue, tolled the Michigan claims. The Carbone group argues that "[s]tate law claims are not tolled under Michigan law for class members who have opted out of an earlier [federal] class action." (Carbone Br. at 23) (citing *Warren Consol. Schs. v. W.R. Grace & Co.*, 205 Mich.App. 580, 518 N.W.2d 508 (1994), *appeal denied*, 448 Mich. 870, 530 N.W.2d 750 (1995)). In addition, the Carbone Defendants argue that the state law claims related to "indirect" purchases should not be tolled because those claims are not viable under federal law and therefore could not have been asserted in the related class action. Plaintiffs concede this claim is only viable under Michigan law.

Plaintiffs rely on a Michigan Supreme Court case, *Cowles v. Bank West*, 476 Mich. 1, 719 N.W.2d 94 (2006), which applied Michigan's tolling rule for class claims to a factually-related federal claim. That tolling rule provides,

(1) The statute of limitations is tolled as to all persons within the class described in the complaint on the commencement of an action asserting a class action.

(2) The statute of limitations resumes running against class members other than representative parties and intervenors

(a) on the filing of a notice of the plaintiff's failure to move for class certification under subrule (B)(2);

(b) 28 days after notice has been made under subrule (C)(1) of the entry, amendment, or revocation of an order of certification eliminating the person from the class;

(c) on entry of an order denying certification of the action as a class action;

(d) on submission of an election to be excluded;

(e) on final disposition of the action.

Mich. Ct. R. 3.501(F). The issue before the Court in *Cowles* was "whether the filing of a class-action complaint tolls the period of limitations under MCR 3.501(F) for a putative class member's claim when that claim was not pleaded in the initial class-action complaint but arose out of the same factual and legal nexus." 719 N.W.2d at 96. The court held that "the filing of such a complaint is sufficient to toll the period of limitations as long as the defendant has notice of both the claim being brought and the number and generic identities of the potential plaintiffs." *Id.* at 96–97.

Plaintiffs argue that although Michigan's highest court has not ruled on whether to permit tolling of state law (non-class) claims while a motion for class certification was pending in a factually-related class action asserting only federal claims, that the Michigan court would likely do so, as *Cowles* indicates a desire to ensure the efficiency of the class action device.[11] Plaintiffs also argue that the Court should adopt federal equitable tolling provisions because to do otherwise would frustrate the purposes of Rule 23, in contravention of the Supremacy Clause.

■ Because this Court finds that the federal class action would not toll the statute of limitations for unpled Michigan claims under federal or Michigan tolling law, the Court need not reach the Supremacy Clause issue. However, the Court shall grant the motion to dismiss the Michigan claims as barred by the statute of limitations.

---

11. When adjudicating a case under state law, this Court must "predict how the highest court of that state would decide the relevant legal issues." *Kowalsky v. Long Beach Twp.*, 72 F.3d 385, 388 (3d Cir.1995).

"Under the Supreme Court's decision in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974), the filing of a class action complaint tolls the statute of limitations for all members of the putative class who, following the denial of certification, intervene or file an independent action." *McKowan Lowe & Co., Ltd. v. Jasmine, Ltd.*, 295 F.3d 380, 382 (3d Cir.2002).[12] However, in this case, Plaintiffs allege that the filing of a class action complaint tolls a *separate* statute of limitations on separate but factually-related claims that were not brought in the class action on anyone's behalf.

The Supreme Court has explained that strong policy reasons support the federal rule tolling individual federal claims when a prior class action was filed asserting identical federal claims.

[A] tolling rule for class actions is not inconsistent with the purposes served by statutes of limitations. Limitations periods are intended to put defendants on notice of adverse claims and to prevent plaintiffs from sleeping on their rights, but these ends are met when a class action is commenced. Class members who do not file suit while the class action is pending cannot be accused of sleeping on their rights; Rule 23 both permits and encourages class members to rely on the named plaintiffs to press their claims. And a class complaint "notifies the defendants not only of the substantive claims being brought against them, but also of the number and generic identities of the potential plaintiffs who may participate in the judgment." *American Pipe*, 414 U.S., at 555, 94 S.Ct. 756. The defendant will be aware of the need to preserve evidence and witnesses respecting the claims of all the members of the class. Tolling the statute of limitations thus creates no potential for unfair surprise, regardless of the method class members choose to enforce their rights upon denial of class certification.

*Crown v. Parker*, 462 U.S. 345, 352–53, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983) (citations omitted).

Those same policy considerations do not support tolling claims brought under separate statutes. Plaintiffs slept on their Michigan rights and the federal action did not notify the defendants of the substantive claims against them in this action. For example, the parties concede that Michigan law permits recovery for indirect purchases—alleged by Plaintiffs Valeo SA and Valeo, Inc.—but federal law does not. Therefore, the defendants might not have been aware of their need to preserve evidence of such claims prior to Plaintiffs' decision to opt out of the class action.

Further, while under federal law " 'the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action' " and "[o]nce the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied," *Crown*, 462 U.S. at 353–54, 103 S.Ct. 2392, Plaintiffs asserting new claims under a different statute should not

---

**12.** The Third Circuit does not appear to have decided whether that same tolling should apply to Plaintiffs who opt out of class actions that are certified. The reasoning of *American Pipe*, that tolling promotes the efficacy of Rule 23 by preventing individual actions, would not apply if the Court permitted tolling for those class members who opted out of class actions where class certification is ultimately granted. On the other hand, the ability to opt out is an important aspect of Rule 23(b)(3), which courts should also be reluctant to undermine.

benefit from this tolling because they would not have been able to continue as parties in the original class action, *see Warren Sch.*, 518 N.W.2d at 511 (no tolling under Michigan law because plaintiff would not have been able to continue as party in original class action). Their claims were not encompassed within the claims asserted by those class members.

■■■ Although the Michigan Supreme Court has not ruled directly on this issue, an appellate court in Michigan has said that a class action in federal court from which a plaintiff opts out does not toll the statute of limitations on that plaintiff's claims in state court. *Warren Sch.*, 518 N.W.2d at 511 ("there is no public policy reason to allow a plaintiff to enjoy the tolling benefit of a class action in which it chose not to join, and to file an otherwise stale cause of action."). Under federal and Michigan law, the burden is on a litigant seeking to invoke equitable tolling to prove entitlement to that tolling. *Pace v. DiGuglielmo*, 544 U.S. 408, 418, 125 S.Ct. 1807, 161 L.Ed.2d 669 (2005); *McLaughlin v. Aetna L. Ins. Co.*, 221 Mich. 479, 483, 191 N.W. 224 (1922). Plaintiffs have not met this burden.

Plaintiffs argue, however, that a separate court rule directs this Court to toll their claims. Under Michigan Court Rule 3.501(F)(2)(d), the statute of limitations is tolled on "related" claims until Plaintiffs file a notice to opt out. Plaintiffs initially sought to opt out from the multidistrict litigation on August 19, 2005. If the Court found that the Michigan courts would permit tolling of state claims for factually related but legally distinct federal class claims, then Plaintiff's claims in this case,

filed one month later, would be timely. However, the Michigan Supreme Court explained this rule in the *Cowles* case and (1) required that the claim arise out of "the same factual *and legal* nexus," 719 N.W.2d at 96 (emphasis added) and (2) included a caveat: there could be no tolling unless the prior class action gave defendants "notice of both the claim being brought and the number and generic identities of the potential plaintiffs," *id.* at 96–97. Because indirect purchases could not have been asserted as a basis for liability in the prior case, those claims did not arise out of the same legal nexus. Nor did the prior class action give Defendants notice of that claim and the Plaintiffs who might assert it. Further, Plaintiffs cannot claim to have relied upon the existence of the MDL class action to preserve their previously unpled state law claims, since Plaintiffs filed their Michigan case while the MDL case was still pending.

The original Complaint in this action was filed September 23, 2005, in the Eastern District of Michigan. Plaintiffs have pled fraudulent concealment through November 4, 2002. Because the Court will not add tolling time on the unpled state claims due to the pendency of the federal class action, Plaintiffs were required to bring their Michigan state law claims by November 4, 2004. Mich. Comp. Laws § 600.5855.[13] They failed to do so; therefore, the Court shall grant the motion to dismiss the Michigan claims on statute of limitations grounds.

## IV. MOTION TO DISMISS BY EMILIO DI BERNARDO

### A. Statute of Limitations

Plaintiffs first asserted claims against Defendant Di Bernardo on June 14, 2006,

---

13. Alternatively, Plaintiffs could assert Michigan antitrust claims for conduct arising after September 23, 2001, under the ordinary four-year statute of limitations. However, the Amended Complaint indicates that the antitrust conspiracy terminated sometime in September 2001.

when they amended the Complaint. As discussed above, there is a four-year statute of limitations for federal and Michigan antitrust claims. However, because Plaintiffs have adequately alleged that Di Bernardo was a member of the conspiracy to fix prices on electrical carbon products and because Plaintiffs have adequately pled fraudulent concealment up until November 4, 2002, the claims are tolled until that date. See n. 10, *supra*. Therefore, Plaintiffs' federal claims were timely against Defendant Di Bernardo.

However, Plaintiffs' Michigan claims would not be timely unless the Court finds that an additional period of time between 2002 and 2006 should be tolled, as Michigan law requires claims to be asserted within two years of discovery. Mich. Comp. Laws § 600.5855.

Plaintiffs allege in their briefing on this motion that they did not learn of Mr. Di Bernardo's involvement in the conspiracy until December 21, 2005 and that the claims against him should be tolled until that date, making the claims timely under Michigan law.

Michigan law requires bringing an antitrust claim within two years "after the person who is entitled to bring the action discovers, or should have discovered, the existence of the claim or the identity of the person who is liable for the claim." Mich. Comp. Laws § 600.5855. Had Plaintiffs asserted in the Amended Complaint that they did not discover Di Bernardo's involvement until 2005, the issue, then, would be whether Plaintiffs should have discovered Di Bernardo's involvement in the conspiracy sooner. Plaintiffs do not address this issue and it is not clear whether they concede that they failed to comply with this discovery rule. Instead, Plaintiffs cite *Michigan v. McDonald Dairy Co.*, 905 F.Supp. 447, 451–52 (W.D.Mich.1995) for the proposition that

federal precedents on tolling should be applied to the state tolling rule. (Pl.'s Br. Opp. to Di Bernardo at 6). However, that case actually explained the distinction between federal and Michigan tolling for fraudulent concealment. The "federal precedent" adopted into Michigan law in that case was the rule that co-conspirators' acts of concealment are attributed to one another. Plaintiffs' citation of *McDonald Dairy* leaves the impression that Michigan permits four years after the date of discovery to file an anti-trust action—it does not.

In any event, the Amended Complaint does not allege fraudulent concealment by Di Bernardo or any other conspirator up until 2005, the date Plaintiffs argue was the date of actual discovery. The Court cannot attribute concealment to Di Bernardo up until that date when none is alleged against a coconspirator, or him. Furthermore, even if Di Bernardo concealed his involvement until December 2005, Plaintiffs inexplicably waited until June 2006 to amend their complaint to add him. This six-month delay is not attributed to any alleged fraud on the part of any conspirator.

 As discussed, Plaintiffs' Michigan claims were not tolled while the class action was pending because the Michigan claims are fundamentally different from the federal claims. More importantly for the claims against Mr. Di Bernardo, he was not a Defendant in the prior action. See *Jama v. U.S. Imm. & Nat. Serv.*, 343 F.Supp.2d 338, 364 (D.N.J.2004) (tolling only as to defendant named in prior complaint); see also *McKowan Lowe & Co. v. Jasmine, Ltd.*, 295 F.3d 380, 384–85 (3d Cir.2002) ("[T]he Court in *American Pipe* held that the tolling rule is consistent with the twin functions of statutes of limitations—providing defendants with timely notice and avoiding stale claims—because the action is tolled only by timely service

of the class complaint on the defendants by the named plaintiffs."). Additionally, under Fed.R.Civ.P. 15(c)(3), the claims against him do not relate back to the date of the original complaint in this action, which did not name him as a party, because he received no notice of claims against him within 120 days of that complaint.

Plaintiffs failed to bring this action against Di Bernardo by November 4, 2004, as Michigan law required. Therefore, the Court shall grant Di Bernardo's motion to dismiss Plaintiffs' Michigan claims against him.

## B. Personal Jurisdiction

 Di Bernardo moves to dismiss the federal antitrust claims against him for lack of personal jurisdiction.[14] Although Plaintiffs bear a burden of establishing jurisdiction, the Court must accept their allegations as true:

> To survive a motion to dismiss for lack of personal jurisdiction, a plaintiff bears the burden of establishing the court's jurisdiction over the moving defendants. However, when the court does not hold an evidentiary hearing on the motion to dismiss, the plaintiff need only establish a prima facie case of personal jurisdiction and the plaintiff is entitled to have its allegations taken as true and all factual disputes drawn in its favor.

*Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir.2004) (citation omitted). When a defendant raises a jurisdictional defense, the plaintiff must then show, "that the cause of action arose from the defendant's forum-related activities (specific jurisdiction) or that the defendant has 'continuous and systematic' contacts with the forum state (general jurisdiction)." *Mel-*

*lon Bank (East) PSFS, N.A. v. DiVeronica Bros., Inc.*, 983 F.2d 551, 554 (3d Cir. 1993).

 The Court will not find specific jurisdiction unless Di Bernardo has purposefully availed himself of the forum

> Specific jurisdiction exists only where the defendant has sufficient minimum contacts with the forum state that it "should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). The "'constitutional touchstone'" is whether the defendant purposefully established those minimum contacts. *North Penn Gas Co. v. Corning Natural Gas Corp.*, 897 F.2d 687, 690 (3d Cir.) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)), *cert. denied*, 498 U.S. 847, 111 S.Ct. 133, 112 L.Ed.2d 101 (1990). A court must find that there was some act by which the defendant "purposefully availed itself" of the privilege of conducting activities within the forum. *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958).

*Mellon Bank*, 983 F.2d at 554. Further, the Court may exercise specific jurisdiction only if the claim in the case at bar arises out of those minimum contacts. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n. 8, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 259 (3d Cir.1998). But "[p]hysical presence within the forum is not required to establish personal jurisdiction over a nonresident defendant." *Id.*

---

14. He also moved to dismiss the Michigan claims on personal jurisdiction grounds, but because the statute of limitations has run on those claims, the Court need not address personal jurisdiction as to the Michigan claims.

■ Di Bernardo argues that the rule permitting a court to aggregate a foreign company's national contacts when determining whether the court has personal jurisdiction over that company does not apply to foreign individuals sued for antitrust violations in the United States. Plaintiffs do not dispute this and it appears to be correct.

When the Court of Appeals for the Third Circuit adopted the national contacts test for personal jurisdiction in federal antitrust actions, it explained that the federal statute permitting nationwide or worldwide service of process was key to its decision. *In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d at 298 (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 369–70 (3d Cir.2002)). In *Pinker*, a securities case, the Third Circuit explained the importance of the statutory service provision to its personal jurisdiction holding:

> Where Congress has spoken by authorizing nationwide service of process, therefore, as it has in the Securities Act, the jurisdiction of a federal court need not be confined by the defendant's contacts with the state in which the federal court sits. *See DeJames v. Magnificence Carriers, Inc.*, 654 F.2d 280, 284 (3d Cir.1981). Following this reasoning, the district courts within this Circuit have repeatedly held that a "national contacts analysis" is appropriate "when appraising personal jurisdiction in a case arising under a federal statute that contains a nationwide service of process provision." *AlliedSignal, Inc. v. Blue Cross of Calif.*, 924 F.Supp. 34, 36 (D.N.J.1996); *see also Green v. William Mason & Co.*, 996 F.Supp. 394, 396 (D.N.J.1998) ("An assessment of personal jurisdiction under [a statutory provision authorizing nationwide service of process] necessitates an inquiry into the defendant's contacts with the national

forum."). We too are persuaded by the reasoning of our prior opinions on the subject, and, consistent with several of our sister courts of appeals, hold that a federal court's personal jurisdiction may be assessed on the basis of the defendant's national contacts when the plaintiff's claim rests on a federal statute authorizing nationwide service of process.

292 F.3d at 369. Thus, it is important to note that 15 U.S.C. § 22 authorizes nationwide service of process against any corporation. The statute provides:

> Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

"It is undisputed that the second clause authorizes nationwide, indeed worldwide, service of process on a defendant corporation in federal antitrust litigation." *In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d 288 at 293. There is no such provision for worldwide or nationwide service on individuals. Thus, the Court will not aggregate Di Bernardo's nationwide contacts to determine whether it has personal jurisdiction over him for the claims asserted in this action.

Rather, the Court will look to the contacts with Michigan, the forum state from which this action was transferred, to determine whether due process permits the assertion of personal jurisdiction over Di Bernardo. *See id.* at 297 n. 11 (explaining that for MDL cases courts conducting personal contacts analysis must look to contacts with forum where case was filed). Because Plaintiffs have not alleged suffi-

cient contact between Di Bernardo and Michigan to meet the requirements of specific or general jurisdiction, the Court does not have personal jurisdiction over him.

 Plaintiffs rely on the fact that several of them have headquarters in Michigan and that, therefore, the effects of Mr. Di Bernardo's conspiracy were felt in Michigan. (Pl.'s Br. Opp. Di Bernardo at 11–12). This allegation, even if properly asserted in the Amended Complaint, is entirely insufficient to satisfy the guarantees of due process. Plaintiffs have alleged no purposeful availment of Michigan by Di Bernardo such that he could reasonably anticipate being haled into court there. Therefore, the Court shall grant his motion to dismiss for lack of personal jurisdiction.

## V. CONCLUSION

For the foregoing reasons, the Court shall grant the motion to dismiss claims arising out of foreign purchases of electrical carbon products; claims arising under Michigan law; and claims against Defendant Di Bernardo. An accompanying Order shall be entered.

### ORDER

This matter is before the Court on Motions to Dismiss the Amended Complaint by Defendants Le Carbone Lorraine, Carbone Lorraine North America Corp., and Carbone of America Industries Corp. [Docket Item 9] and by Emilio Di Bernardo [Docket Item 43]. The Court heard oral argument on the motions; has considered the submissions of the parties in support thereof and opposition thereto; for the reasons explained in the Opinion of today's date; and for good cause shown;

IT IS this *9th* day of **August, 2007** hereby

ORDERED that the Motion to Dismiss the Amended Complaint by Defendants Le Carbone Lorraine, Carbone Lorraine North America Corp., and Carbone of America Industries Corp. [Docket Item 9] shall be, and hereby is, **GRANTED in part** as to all claims arising out of foreign purchases and all claims arising under Michigan law; and

IT IS FURTHER ORDERED that the Motion to Dismiss by Defendant Emilio Di Bernardo [Docket Item 43] shall be, and hereby is, **GRANTED** as to all claims against him.